

07 CV 10514

Theodore V. H. Mayer
Vilia B. Hayes
Robb W. Patryk
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

*Attorneys for Defendant Merck & Co., Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

ANDERSON, MARGARET, et vir, ANDERSON,
JOHN, CAMPBELL, JOHN, et ux, CAMPBELL,
ELIZABETH, COLLINS, MARION,
HAMILTON, WILLIAM, et ux, HAMILTON,
JANETTE, REID, HENRY, et ux, REID,
CAROLYN, WILLIAMSON, JOHN, et ux,
WILLIAMSON, MARGARET,

                           Plaintiffs,

            -against-

MERCK & CO., INC., and MERCK, SHARP &
DOHME, LTD.,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - x

NOV 2 1 2007
U.S.D.C. S.D. N.Y.
CASHIERS

No.: _____

**NOTICE OF REMOVAL OF
DEFENDANT MERCK & CO.,
INC.**

        PLEASE TAKE NOTICE that Merck & Co., Inc. ("Merck") hereby removes this

action pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 from the Supreme Court of the State of

New York, County of New York to the United States District Court for the Southern District of

New York and respectfully states to this Court the following:

        1.      This action involves allegations regarding the prescription drug Vioxx®.

On February 16, 2005, the Judicial Panel on Multidistrict Litigation issued an order transferring

148 Vioxx products liability cases to the United States District Court for the Eastern District of

Louisiana (Fallon, J.) for coordinated pretrial proceedings under 28 U.S.C. § 1407. *In re Vioxx*

*Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005). Merck intends to seek the transfer of this action to that Multidistrict Litigation, *In re Vioxx Marketing, Sales Practices and Products Liability Litigation,* MDL No. 1657, and will shortly provide notice to the MDL Panel of this action pursuant to the "tag-along" procedure contained in the MDL Rules.

2.    Plaintiffs Margaret Anderson, John Anderson, John Campbell, Elizabeth Campbell, Marion Collins, William Hamilton, Janette Hamilton, Henry Reid, Carolyn Reid, John Williamson, and Margaret Williamson ("Plaintiffs") filed this civil action against Merck in the Supreme Court of the State of New York, County of New York, bearing Index Number 07/113082. Plaintiffs seek damages for "serious and permanent physical and emotional injuries…[and] economic loss" that they allege were caused by their use of the prescription medicine Vioxx. (Compl. ¶ 48.) Plaintiffs' claims are based on alleged theories of products liability – defective design, products liability – failure to warn, violation of the New Jersey Consumer Fraud Act, breach of express warranty, violation of General Business Law § 349, and loss of consortium.

3.    As more fully set out below, this case is properly removed to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 because Merck has (1) satisfied the procedural requirements for removal and (2) this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

## I.    MERCK HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

4.    Merck has not yet been served with a copy of Plaintiffs' Complaint ("Complaint"). Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1441. A true and correct copy of the Summons and Complaint are attached hereto as Exhibit 1.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 112(b) because it is the "district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

6.    No previous application has been made for the relief requested herein.

7.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs and a copy is being filed with the Clerk of the Court for the Supreme Court of the State of New York, New York County.

8.    Defendants who have not been served and/or are fraudulently joined need not consent to removal.[1] Nevertheless, Defendant Merck Sharp & Dohme Limited consents to and joins in this Removal.[2] *See* Defendant Merck Sharp & Dohme Limited's Consent to Removal (attached hereto as Ex. 2).

## II.    REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441.

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest and is between citizens of different states.

---

[1].   28 U.S.C. § 1441(b) does not bar removal. It is well-settled that co-defendants who are fraudulently joined need not join in the removal. *See Jernigan v. Ashland Oil Inc.* 989 F.2d 812, 815 (5th Cir. 1993); *Miami Pipe Line Co., Inc. v. Panhandle E. Pipe Line Co.*, 384 F.2d 21, 27 (10th Cir. 1967). MSD has been fraudulently joined and, therefore, does not need to consent to removal.

[2].   By joining in this Removal, Defendant Merck Sharp & Dohme Limited does not waive its objections to service of process or personal jurisdiction. *Cowen v. Am. Med. Sys.*, 411 F. Supp. 2d 717, 720 (E.D. Mich. 2006) (citing *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("The Supreme Court held over 75 years ago that defendant does not waive objections to service of process or personal jurisdiction by removing a state court action to federal court.").

A.    **There is Complete Diversity Between Plaintiffs and All Properly Joined Defendants.**

10.    There is complete diversity between Plaintiffs and Merck. *See* 28 U.S.C. § 1332(a)(2).

11.    Upon information and belief, Plaintiffs reside in Scotland and are citizens of the United Kingdom.  Plaintiffs' allegations repeatedly refer to Merck's alleged manufacturing of Vioxx in Scotland, England, Wales and Ireland (Compl. ¶ 5), Merck's alleged communications with regulatory agencies in Scotland, England, Wales and Ireland (Compl. ¶ 7), Merck's alleged marketing of Vioxx in Scotland, England, Wales and Ireland (Compl. ¶ 8), Merck's alleged profiting from the sale of Vioxx in Scotland, England, Wales and Ireland (Compl. ¶ 9), and Merck's alleged misleading of consumers in Scotland, England, Wales and Ireland (Compl. ¶ 10).  Based on this, on November 8, 2007, Merck sent a letter to counsel for Plaintiffs stating that Merck would assume that Plaintiffs were citizens of Scotland, England, Wales or Ireland for purposes of diversity.  Merck requested that Plaintiffs' counsel respond within seven days if that assumption was incorrect.  Plaintiffs' counsel responded by telephone on November 14, 2007, confirming that all Plaintiffs reside in Scotland.  Accordingly, upon information and belief, the United Kingdom is a foreign state in which Plaintiffs are domiciled and, therefore, the foreign state of which Plaintiffs are citizens for purposes of determining diversity. *See* 28 U.S.C. § 1332(a); *see also Linardos v. Fortuna*, 157 F.3d 945, 946 (2d Cir. 1998) ("[f]or purposes of diversity jurisdiction, a party's citizenship depends on his domicile").

12.    Merck is, and was at the time Plaintiffs commenced this action, a corporation organized under the laws of the State of New Jersey with its principal place of business at One Merck Drive, White House Station, New Jersey and, therefore, is a citizen of New Jersey for purposes of determining diversity.  28 U.S.C. § 1332(c)(1).

4

13.    MSD is and was at the time Plaintiffs commenced this action, a corporation organized under the laws of the United Kingdom with its principal place of business located in the United Kingdom. However, because MSD is fraudulently joined, its citizenship must be ignored for removal purposes. *See, e.g., Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1359-1360 (11th Cir. 1996), *abrogated on other grounds by Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000).

**B.    MSD is Fraudulently Joined.**

14.    A defendant is fraudulently joined when "there is no possibility, based on the pleadings, that plaintiff can state a cause of action against the non-diverse defendant in state court." *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998). Here, there is no possibility Plaintiffs can prevail on their claims against MSD – and MSD is fraudulently joined – for the following reasons.

15.    *First*, MSD is fraudulently joined because Plaintiffs have made no allegations against it in the Complaint, and there is thus no reasonable basis to predict that Plaintiffs could prevail on any claim against MSD. Indeed, other than the caption, there is no mention of MSD anywhere in the Complaint.[3] In the absence of specific factual allegations concerning the actions of MSD, there is no basis for a claim against it and MSD is fraudulently joined in this action. *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 00 Civ. 2843 (LAK), 2002 WL 31852826, *2 (S.D.N.Y. Dec. 18, 2002) ("an entirely conclusory allegation…is insufficient" to defeat fraudulent joinder); *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 392-93

---

3.    It should be noted that Plaintiffs' co-counsel filed a similar complaint in the district court of Tyler County, Texas. *See Braid v. Merck & Co., Inc. et al.*, No. 20159-07, removed to the Eastern District of Texas and subsequently transferred to the Vioxx MDL pending in the Eastern District of Louisiana. (Hayes Decl. Ex. 3.) That complaint is almost identical to the present Complaint except that the *Braid* complaint contains allegations against MSD. It appears that Plaintiffs' counsel in the instant case has copied the *Braid* complaint, removed the allegations as to MSD, and left MSD in the caption of the case. It may be that Plaintiffs have no intent to proceed against MSD, but nevertheless failed to remove MSD from the case caption.

(5th Cir. 2000) (defendant tobacco distributors were fraudulently joined where plaintiff alleged no particular activity on part of defendants); *Griggs v. State Farm Lloyds,* 181 F.3d 694, 699 (5th Cir. 1999) (in-state defendant fraudulently joined where plaintiff fails to allege a factual basis for claims against it); *Strong v. First Family Fin. Servs., Inc.,* 202 F. Supp. 2d 536, 545 (S.D. Miss. 2002) (denying remand; non-diverse defendant was fraudulently joined where plaintiff asserted mere "conclusory" allegations, "unaccompanied by any factual allegation").

16.     The only allegations even theoretically pertaining to MSD are conclusory allegations referring to "defendants." *See, e.g.,* Compl. ¶¶ 21, 22, 46. However, there are also many allegations and references in the demand for judgment to a single "defendant." *See, e.g.,* Compl. ¶¶ 5, 34, 48, 55, 71, 80, 100. In sum, MSD is fraudulently joined and its citizenship should be ignored for purposes of determining diversity jurisdiction because the only allegations even arguably directed against MSD are conclusory and woefully inadequate to state a claim.

17.     ***Second***, MSD is fraudulently joined because the Court cannot exercise personal jurisdiction over it. *Villar v. Crowley,* 990 F.2d 1489 (5th Cir. 1993) (upholding district court decision that complete diversity existed where "there was 'no possibility' that [the Plaintiffs] could establish that the court had personal jurisdiction over the foreign defendants"). There are two requirements for New York courts to exercise personal jurisdiction over MSD, a nondomicilliary defendant: 1) the defendant must be subject to personal jurisdiction under New York law and 2) the assertion of personal jurisdiction pursuant to New York law must comport with the requirements of due process. *Bensusan Rest. Corp. v. King,* 126 F.3d 25, 27 (2d Cir. 1997); U.S. Const. Amend. XIV; N.Y.C.P.L.R. § 302; *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413-14 (1984). For the reasons set forth below, the New York courts cannot

exercise personal jurisdiction over MSD and therefore, MSD is fraudulently joined as a defendant.

18.    Federal due process requirements are satisfied when personal jurisdiction is asserted over a nonresident defendant that has "certain minimum contacts with [the forum] such that the maintenance of the suits does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). A nonresident defendant's contacts with the forum state can give rise to either specific or general jurisdiction. *See Helicopteros Nacionales de Colombia*, at 414 n. 8, 419 n. 9; *Broadcasting Rights Int'l Corp. v. Societe Du Tour De France, S.A.R.L.*, 675 F. Supp. 1439, 1443 (S.D.N.Y. 1987).

19.    For the reasons set forth below, MSD's contacts with New York do not give rise to either specific or general jurisdiction. Moreover, it would offend the traditional notions of fair play and substantial justice for New York courts to exercise personal jurisdiction over MSD. Therefore, MSD is fraudulently joined as a defendant.

20.    Where "a controversy is related to or arises out of a defendant's contacts with the forum," specific jurisdiction is established when there is a "relationship among the defendant, the forum, and the litigation." *Helicopteros Nacionales de Colombia*, at 414.

21.    New York's Long Arm statute permits the exercise of specific jurisdiction over a non-domiciliary defendant in three situations. First, a non-resident defendant will come under the jurisdiction of New York courts where that defendant has transacted business within New York. NY CPLR § 302(a)(1). Second, a non-resident defendant is subject to New York jurisdiction where that defendant has committed a tortious act in the state. NY CPLR § 302(a)(2). Third, long arm jurisdiction is satisfied where a resident of the state can show that an

injury occurred within the state and that either 1) the non-resident defendant does business within the state or 2) the non-resident defendant should reasonably expect its acts to have consequences within the state. NY CPLR § 302(a)(3).

22. Here, New York courts do not have specific jurisdiction over MSD because facts supporting specific jurisdiction under the three categories of NY CPLR § 302 are neither alleged nor exist. There is no relationship between MSD's alleged liability and New York state. Plaintiffs make no mention of any acts or omissions by MSD in the State of New York. In fact, the only mention of the forum state is with regard to Merck, not MSD. There is no allegation that MSD did business in New York or otherwise undertook any actions in New York. This complete lack of allegations against MSD is certainly not enough to confer specific jurisdiction on the forum state of New York.

23. In contrast, general jurisdiction exists when a nonresident defendant "is engaged in such a continuous and systematic course of doing business [in New York] as to warrant a finding of its presence in this jurisdiction." *Broadcasting Rights Int'l Corp. v. Societe due Tour de France, S.A.R.L.*, 675 F. Supp. 1439, 1443 (S.D.N.Y. 1987). There are no such allegations here; nor are there facts to support any such allegations.

24. The contacts to support general jurisdiction must come from the conduct of the defendant itself. The fact that MSD is a subsidiary of Merck does not support a finding that New York courts can assert jurisdiction over MSD. This test "does not subject a subsidiary corporation to personal jurisdiction simply because a state has jurisdiction over the parent, even if the parent is the sole shareholder of the subsidiary." *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65, 67 (S.D.N.Y. 1979); *see Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (noting "nor does jurisdiction over a parent corporation automatically establish

8

jurisdiction over a wholly owned subsidiary."). In order to find a foreign subsidiary present in New York, there must be a showing that "(1) the relationship between the foreign parent and the local subsidiary gives rise to a valid inference of an agency relationship or (2) the control by the parent of the subsidiary is so complete that the subsidiary is, in fact, merely a department of the parent." *Saraceno*, 83 F.R.D. at 67. The same is true where the foreign corporation over which jurisdiction is sought is a subsidiary of the corporation over which there is jurisdiction in New York. *Id.* at 67 n.5. There is no inference of an agency relationship by Merck here nor is Merck so in control of MSD that MSD is a "department" of Merck. MSD is independently capitalized and has its own corporate structure. MSD and Merck maintain separate books and accounts and do not share common directors and/or officers. Because there is no agency or department relationship between MSD and Merck, New York courts cannot exercise personal jurisdiction over MSD based on Merck's contacts with New York. Accordingly, MSD is fraudulently joined.

25.     Additionally, and in any event, exercising personal jurisdiction over MSD does not comport with due process. A court must consider several factors in determining whether a forum state's exercise of jurisdiction over a defendant "offend[s] 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). The factors that the court must consider include: "(1) the burden on the defendant; (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987).

26.     When these factors are weighed in this case, it is apparent that New York courts' exercise of personal jurisdiction over MSD is not reasonable and offends traditional notions of fair play and substantial justice. The *Asahi* court weighed the three factors in

9

determining reasonableness. The interest of the plaintiff was given little weight because the plaintiff was not a resident of the forum state. *Asahi*, 480 U.S. at 114. The interest of the forum was given little weight because the transaction in question took place outside the forum state. *Id.* The court gave significant weight to the burden on the foreign defendant, explaining, the "unique burdens placed upon one who must defend oneself in a foreign legal system." *Id.* Applying the *Asahi* factors to this case, the interest of the Plaintiffs should be given little weight because, on information and belief, the Plaintiffs are citizens of Scotland, were prescribed Vioxx in Scotland, consumed Vioxx in Scotland, and allegedly suffered debilitating and permanently injurious ill effects from Vioxx in Scotland. Furthermore, New York has no interest in litigating a dispute regarding an alleged act or omission of a foreign defendant that did not take place in New York and where none of the plaintiffs are citizens of New York. Finally, significant weight should be given to the burden on MSD because MSD is a foreign defendant with its principal place of business in the United Kingdom. After weighing the *Asahi* factors, it is unreasonable for New York courts to exercise jurisdiction over MSD because to do so would offend traditional notions of fair play and substantial justice.

27.    For this reason, too, there is no possibility that Plaintiffs will be able to establish a cause of action against MSD in New York courts. MSD's citizenship should therefore be ignored for purposes of assessing diversity.

### C.    The Amount In Controversy Requirement Is Satisfied.

28.    It is apparent from the face of the Complaint that Plaintiffs seek recovery of an amount in excess of $75,000, exclusive of costs and interest. Plaintiffs seek damages for alleged "serious and permanent physical and emotional injuries...[and] economic loss" that Plaintiffs allege were caused by their use of the pharmaceutical Vioxx. (Compl. ¶ 48.) The foregoing makes it apparent that the amount in controversy for each Plaintiff is well in excess of

10

$75,000. *See, e.g., James v. Gardner*, 2004 U.S. Dist. LEXIS 23174, at *10 (E.D.N.Y. 2004) (where plaintiff fails to represent a definitive amount in controversy, the court may look to defendant's petition for removal for a showing of reasonable probability that plaintiff's claim for damages exceeds the jurisdictional amount).

          29.    Federal courts around the country have ruled that subject matter jurisdiction pursuant to 28 U.S.C. § 1332 exists in similar actions alleging personal injuries caused by Vioxx and, either explicitly or implicitly, concluded that the amount in controversy exceeded $75,000. *See, e.g., Morgan v. Merck & Co., Inc.*, No. 3:03cv435WS, slip op. at 2 (S.D. Miss. Mar. 29, 2004); *Benavidez v. Merck & Co., Inc.*, No. L-03-134, slip op. at 1 (S.D. Tex. Apr. 16, 2004); *Stubblefield v. Merck & Co., Inc.*, Civ. No. H-02-3139, slip op. at 1 (S.D. Tex. Oct. 8, 2002); *Zeedyk v. Merck & Co., Inc.*, No. 02-C-4203, slip op. at 1 (N.D. Ill. August 30, 2002); *Abrusley v. Merck & Co., Inc.*, No. 02-0196, slip op. at 2 n.3 (W.D. La. June 18, 2002); *Jones v. Merck & Co., Inc.*, Civ. No. 02-00186, slip op. at 2 (D. Haw. June 5, 2002). (Slip opinions attached collectively, as Exhibit 4.) These courts were all confronted by similar complaints in which plaintiffs alleged that they suffered similar injuries as a result of their use of Vioxx, and all found, either explicitly or implicitly, that the requirements for federal diversity jurisdiction, including the amount in controversy, were satisfied.

WHEREFORE, Defendant Merck respectfully removes this action from the

Supreme Court of the State of New York, County of New York, pursuant to 28 U.S.C. § 1441.

DATED:    New York, New York
          November 20, 2007

                                    Respectfully submitted,

                                    HUGHES HUBBARD & REED LLP

                                    By: _____
                                         Theodore V. H. Mayer
                                         Vilia B. Hayes
                                         Robb W. Patryk

                                    One Battery Park Plaza
                                    New York, New York  10004-1482
                                    (212) 837-6000

                                    *Attorneys for Defendant Merck & Co., Inc.*

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
ANDERSON, MARGARET, et vir, ANDERSON,
JOHN CAMPBELL, JOHN, et ux, CAMPBELL,
ELIZABETH, COLLINS, MARION, HAMILTON,                    **SUMMONS**
WILLIAM, et ux, HAMILTON, JANETTE, REID,
HENRY, et ux, REID, CAROLYN WILLIAMSON,
JOHN, et ux, WILLIAMSON, MARGARET,

               Plaintiffs,                    07113082

     VS                                        **FILED**

MERCK & CO., INC., AND MERCK, SHARP             NEW YORK
& DOHME, LTD.,                                   COUNTY CLERKS OFFICE
                                                 SEP 28 2007
              Defendant.
------------------------------------------------------------/X

TO THE DEFENDANT:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to

serve a copy of your answer or, if the complaint is not served with summons, to serve a notice

of appearance, on the Plaintiffs' Attorneys within 20 days after service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons

is not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Dated: New York, New York
      September 24, 2007

                    _Charles D. Cole, Jr._
                    Charles D. Cole, Jr.
                    NEWMAN FITCH ALTHEIM MYERS, P.C.
                    Attorneys for Plaintiffs
                    14 Wall Street
                    New York, New York 10005

Index No.                          RJI No.                    Hon.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

**ANDERSON, MARGARET, et vir, ANDERSON, JOHN CAMPBELL, JOHN, et ux, CAMPBELL, ELIZABETH, COLLINS, MARION, HAMILTON, WILLIAM, et ux, HAMILTON, JANETTE, REID, HENRY, et ux, REID, CAROLYN WILLIAMSON, JOHN, et ux, WILLIAMSON, MARGARET,**

                                              **Plaintiffs,**

            VS

**MERCK & CO., INC.,**

                                              **Defendant.**

---

### SUMMONS AND COMPLAINT

---

NEWMAN FITCH ALTHEIM MYERS, P.C.
*Attorneys for Plaintiffs*
*Office and Post Office Address, Telephone*
14 WALL STREET
NEW YORK, N.Y. 10005-2101
(212) 619-4350

To                                          Signature (Rule 130-1.1-a)
                                            ..........................................................
                                            Print name beneath
Attorney(s) for

Service of a copy of the within                          is hereby admitted.
Dated.                                      ..........................................................
                                            Attorney(s) for

Please take notice
☐ NOTICE OF ENTRY
that the within is a *(certified)* true copy of a
duly entered in the office of the clerk of the within named court on
☐ NOTICE OF SETTLEMENT
that an order                          of which the within is a true copy will be presented for
settlement to the HON.                              one of the judges
of the within named court, at
on                    at              M

Dated,                          Yours, etc.

                          NEWMAN FITCH ALTHEIM MYERS, P.C.
                          *Attorneys for*
TO                        *Office and Post Office Address*
                          14 WALL STREET
Attorney(s) for           NEW YORK, N.Y. 10005-2101

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

ANDERSON, MARGARET, et vir, ANDERSON,
JOHN CAMPBELL, JOHN, et ux, CAMPBELL,
ELIZABETH, COLLINS, MARION, HAMILTON,                    **COMPLAINT**
WILLIAM, et ux, HAMILTON, JANETTE, REID,
HENRY, et ux, REID, CAROLYN WILLIAMSON,
JOHN, et ux, WILLIAMSON, MARGARET,

07113082

          **Plaintiffs,**

      vs

MERCK & CO., INC., AND MERCK, SHARP
& DOHME, LTD.,

          **Defendant.**

-----------------------------------------------------------------X

*FILED*
*NEW YORK*
*COUNTY CLERKS OFFICE*
*SEP 28 2007*

      Plaintiffs Anderson, Margaret, et vir, Anderson, John; Campbell, John, et ux,

Campbell, Elizabeth, Collins, Marion, Hamilton, William, et ux, Hamilton, Janette, Reid,

Henry, et ux, Reid, Carolyn, and Williamson, John, et ux, Williamson, Margaret, by their

attorneys, Newman Fitch Altheim Myers, P.C., complaining of Defendants Merck & Co.,

Inc., a New Jersey corporation doing business at all relevant times in New York County, but

having its principal place of business at One Merck Drive, Whitehouse Station, New Jersey

08889, allege as follows:

**A.   PARTIES**

      1.    As more particularly pleaded below, each plaintiff maintains that the

pharmaceutical drug, Vioxx, is defective, dangerous to human health, unfit and unsuitable to

be marketed and sold in commerce, and lacked proper warnings as to the dangers associated

with its use.

      2.    The living Plaintiffs who consumed Vioxx were injured as a result of his

or her use of Vioxx. The deceased consumers of Vioxx, if any, whose estates are (through

their respective administrators or executors) plaintiffs were injured and expired as a result of his or her use of Vioxx. The spouses of the living Plaintiffs and the wrongful death beneficiaries of the deceased consumers of Vioxx therefore seek, to the extent denoted herein and allowed by applicable law, all such compensatory damages, punitive damages, all ascertainable economic losses, including, if applicable, survival damages, wrongful death damages, treble damages, attorneys' fees, reimbursement of the cost of obtaining Vioxx, reimbursement for all past, present and future health and medical care costs related to Vioxx, per quod and derivative damages.

3.     The Defendant, Merck & Co., Inc. (hereinafter "Merck"), is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

4.     At all times relevant hereto, Defendant Merck was and continues to be engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug, Vioxx.

5.     Defendant, at all times material hereto, directly caused Vioxx to be manufactured, tested, packaged, formulated, designed, sold, distributed, licensed, and labeled for sale and use in Scotland, England, Wales and Ireland as in the United States..

6.     Merck conducted meetings and conferences in New York and elsewhere in the U.S. with the intent and effect of increasing its sales in all markets including the latter four nations.

7.     Merck utilized its research and development work regarding Vioxx and Merck's communication with the United States Food and Drug Administration ("FDA") in order to market Vioxx in New York and in Scotland, England, Wales & Ireland.

8.    Merck utilized the decision-making and the marketing experience and the regulatory experience of Merck personnel in the U.S, in order to market and label Vioxx in Scotland, England, Wales & Ireland.

9.    Merck profited financially from the sale of Vioxx in Scotland, England, Wales & Ireland.

10.    From its U.S. offices, Merck controlled and directed the deceptive and misleading. marketing and labeling and regulatory obfuscation associated with the sale of Vioxx in Scotland, England, Wales & Ireland.

## FACTS COMMON TO ALL COUNTS

11.    Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

12.    Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

13.    Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23 , 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

14.    Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/ml and 25 mg/ml, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

15.    On or about May 20,1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

16.    At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

17.    The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

18.    Defendant Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PU13s During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

19.    The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking Naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

20.    In industry-sponsored studies presented at the European United League Against

Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension.

21.    Defendants continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Defendants engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced defendant's financial stability to the detriment of its consumers. As a result of defendant's scheme, they reaped billions of dollars in profit and appropriated a large share of the market in the United States and The United Kingdom.

22.    Defendants continued to profit from its scheme by withholding information from Plaintiff, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over Naproxen consumption.

23.    On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what Merck had concealed that the relative risk of developing a "confirmed adjudicated thrombotic

cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to Naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. See Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22129, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

24.    In the JAMA study, the authors stated that "by decreasing PG-I2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events." Id. at 957. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclinithromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, Journal of Science, V. 296:539-541, Apr. 19, 2002.

25.    On September 17,2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."

26.    The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MI's) compared to patients on the comparator non-steroidal anti-inflammatory drug (MAID), Naprosyn (Naproxen).

27.    The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions:"

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.
>
> Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior

written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1,2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion. A written statement of your intent to comply with "1" and "2" above.

28.    On April 11 , 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

29.    The revised labeling further states that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms.

> Clinical Studies in OA and BA with VIOXX 50 mg (Twice the highest dose recommended for chronic use) In DA and RA clinical trials which contained VIOXX 12.5 et 25 mg as well as VIOXX 50 mg, VIOXX 50 mg DD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious' adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

30.    Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.

31.    The revised "Patient Information" sheet does not add any information about the results of the VIGOR study."

32.    The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

33.    Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal side effects of Vioxx.

34.    Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious gastrointestinal side effects, defendant has concealed and/or downplayed the dangers associated with Vioxx. In its 2001 Annual Report, for

example, Defendant Merck states: The Company also noted t hat a number 0 f federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx. . . The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

35.    Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Merck fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

"Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR *, FOSAMAX and SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61 % for the fourth quarter.

"Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market

in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter. A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID Naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

36.    In October 1997, Merck sponsored a study lead by Dr. Garrett Fitzgerald, of the University of Pennsylvania, known as Protocol 023 a.k.a. the Fitzgerald Study. During this study, Dr. Fitzgerald observed that patients taking VIOXX™ had significantly lower levels of prostacyclin metabolites in their urine than patients taking placebo. Scientists believe that prostacyclin in the bloodstream inhibits platelet aggregation -- i.e. blood clotting. Dr. Fitzgerald hypothesized that if VIOXX™, as a COX-2 inhibitor was causing reduced prostacyclin levels in blood vessels, as well as urine, then COX-2 inhibitors might result in increased blood clots and associated cardiovascular events. Merck Board of Scientific Advisors, an independent group of scientists, in response to the Fitzgerald hypothesis, recommended that Merck implement a procedure in all future VIOXX™ studies that would

enable the company to develop data on a pooled basis to better understand future cardiovascular events during the clinical trials.

37.    Merck never engaged in the studies recommended by the FDA to properly evaluate the efficacy of VIOXX™. Merck simply avoided conducting other Outcomes studies to determine if VIOXX™ had improved gastrointestinal ("GI") benefits because of the fear of demonstrating the possibility of increased cardiovascular ("CV") events. Internal e-mails demonstrate an attempt by Merck employees to manipulate studies and conceal safety information on VIOXX™.

38.    In January of 1999, Merck began the VIOXX™ Gastrointestinal Outcomes Research ("VIGOR') trial to determine whether VIOXX™ reduced the risk of PUB's relative to Naproxen. The VIGOR trial had approximately 8,100 patients and the "unblended" results of the study were released in March of 2000. Patients requiring aspirin for cardiac reasons were excluded from the trial. There were fewer CV thrombotic events in patients taking Naproxen than in patients taking VIOXX™. Patients taking VIOXX™ suffered more than twice as many serious CV events and five times as many heart attacks than patients taking the drug Naproxen. 36. In September 2001, the FDA issued a Warning Letter to Merck's then Chief Executive Officer, Raymond V. Gilmartin. The letter stated Merck's promotional activities in relation to VIOXX™ were "false, lacking in fair balance, or otherwise misleading."

39.    After learning of the VIGOR results, Merck began to design a large study of VIOXX™. In 2001, Merck began a study involving three long-term trials in patients at risk of colon or prostate cancer. One of these trials was a three-year study to determine if VIOXX™ could prevent recurrent colon polyps and was known as APPROVe. The preliminary results of APPROVe showed an increased rate of adverse CV events in study participants taking 25 mg VIOXX™ as compared to patients receiving a placebo. On September 23, 2004,

the External Safety Monitoring Board for APPROVe delivered preliminary results and recommended that Merck stop the study because of the number of adverse cardiovascular events. On September 30, 2004, Merck withdrew VIOXX™ from the worldwide market.

40.    Despite the foregoing, defendant continued to represent to consumers that Vioxx is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. Defendants downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

## COUNT I

## PRODUCTS LIABILITY - DEFECTIVE DESIGN

41.    Plaintiff(s) repeat and incorporate by reference all paragraphs above as if fully set forth herein.

42.    Defendants are the researchers, developers, designers, labelers, manufacturers, distributors, formulators, packages, marketers, promoters, suppliers and sellers of Vioxx, which is defective and unreasonably dangerous to consumers.

43.    Vioxx is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. Vioxx is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other nonsteroidal anti-inflammatory medicines and similar drugs on the market and is more dangerous than ordinary consumers can reasonably foresee.

44.    The defective condition of Vioxx renders it unreasonably dangerous, and Vioxx was in this defective condition at the time it left the hands of the defendant. Vioxx was expected to and did reach consumers, including Plaintiff(s), without substantial change in the

condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce. Vioxx sold in The United Kingdom was the same as Vioxx sold in New Jersey and elsewhere in the United States.

45.    Plaintiffs were unaware of the significant hazards and defects in Vioxx. Vioxx was unreasonably dangerous in that it was more dangerous than would be reasonably contemplated by the ordinary user. During the period that Plaintiff(s) were taking Vioxx, the medication was being utilized in a manner that was intended by defendant. At the time Plaintiff(s) received and consumed Vioxx, it was represented to be safe and free from latent defects.

46.    Defendants are strictly liable to Plaintiffs for designing, formulating, packaging, marketing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of defendant because of the design defects.

47.    Defendants knew or should have known of the danger associated with the use of Vioxx, as well as the defective nature of Vioxx, but continued to design, manufacture, formulate, sell, distribute, market, promote and/or supply Vioxx in a knowing and/or reckless fashion so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

48.    As a direct and proximate cause of the design defect and defendant's misconduct as set forth herein, Plaintiff(s) have suffered and continue to suffer serious and permanent physical and emotional injuries, have expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

Wherefore, plaintiff (s) demands judgment against defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT II

### PRODUCTS LIABILITY - FAILURE TO WARN

49.    Plaintiffs repeat and incorporate by reference all paragraphs above as if fully set forth herein.

50.    Defendants researched, developed, formulated, packaged, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Vioxx, and in the course of same, directly advertised or marketed the product to FDA, United Kingdom regulators, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

51.    Vioxx was under the exclusive control of the defendant as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of Vioxx, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury with such use.

52.    Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx so that no medical care provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

53.    Defendants failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Vioxx posed serious and potentially life-threatening

side effects and complications with respect to which full and proper warning accurately and fully reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA, United Kingdom regulators, and the public, including the Plaintiff(s).

54. Vioxx, which was researched, developed, formulated, packaged, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by defendant, was defective due to inadequate post-marketing warnings and/or instruction because, after defendant knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx, defendant failed to provided adequate warnings to medical care providers, the FDA, United Kingdom regulators and the consuming public, including Plaintiff( s), and continued to promote Vioxx aggressively.

55. As direct and proximate result of the conduct of defendant as aforesaid, Plaintiff(s) have suffered and continue to suffer serious and permanent physical and emotional injuries, have expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

Wherefore, plaintiffs demand judgment against defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III

## NEW JERSEY CONSUMER FRAUD ACT

56. Plaintiffs repeat and incorporate by reference all paragraphs above as if fully set forth herein.

57.    Prescription drugs such as Vioxx are "merchandise," as that term is defined by the Consumer Fraud Act ("Act") N.J.S.A. 56:8-1 et seq. 56. Defendants are the researchers, developers, designers, testers, manufacturers, formulators, packagers, inspectors, labelers, distributors, marketers, promoters, sellers and/or otherwise released Vioxx into the stream of commerce.

58.    Defendants knew or should have known that the use of Vioxx x causes serious and life threatening injuries but failed to warn the public, including Plaintiffs, of same.

59.    In violation of the Act, defendant made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts from Plaintiffs) in product packaging, labeling, medical advertising, direct-to-consumer advertising, promotional campaigns and materials, among other ways, regarding the safety and use of Vioxx. Moreover, defendant downplayed and/or understated the serious nature of the risks associated with Vioxx in other to increase the sales of Vioxx and secure a greater share of the COX-2 market, and made efforts to control medical opinion by intimidation and by funding misleading literature and professional presentations.

60    Defendants' statements and omissions were undertaken with the intent that the FDA, United Kingdom regulators, physicians, and consumers, including the Plaintiff(s), would rely on the defendant's statements and/or omissions.

61.    Defendants knew of the growing public acceptance of the misinformation and misrepresentations regarding the safety and efficacy of Vioxx but remained silent because defendant's appetite for significant future profits far outweighed their concern (if any) for the health and safety of the Plaintiff(s).

62.    Plaintiffs' physician(s) prescribed and/or otherwise provided Plaintiffs with Vioxx, and Plaintiffs consumed Vioxx, primarily for personal and family reasons and

suffered and will suffer ascertainable losses of money as a result of the defendant's use or employment of the methods, acts, or practices alleged herein.

63.    The aforesaid promotion and release of Vioxx into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts with the intent that others would rely upon such concealment, suppression or omission in connection with the sale or advertisement of such merchandise or services by defendant, in violation of the New Jersey Consumer Fraud Act., N.J.S.A. 56:8-1 et seq.

64.    Defendants concealed, omitted, or minimized the side effects of Vioxx or provided misinformation about adverse reactions, risks and potential harms from Vioxx and succeeded in persuading consumers to purchase and ingest Vioxx despite the lack of safety and the risk of adverse medical reactions, including cardiovascular events and gastrointestinal effects.

65.    Defendants' practice of promoting and marketing Vioxx created and reinforced a false impression as to the safety of Vioxx, thereby placing consumers at risk of serious and potential lethal effects.

66.    Vioxx lacked appropriate warnings, and the packaging and labels used by defendant were misleading, inaccurate, incomplete, and/or untimely.

67.    Defendants violated their post-manufacture duty to warn which arose when they knew, or with reasonable care should have known, that Vioxx was injurious and sometimes fatal.

68.    At the time when consumers purchased and ingested Vioxx, defendant intended that others would rely upon the concealment, suppression or omission of the risks of ingesting Vioxx.

69.    Defendants' actions in connection with manufacturing, distributing, and marketing of Vioxx as set forth herein evidence a lack of good faith, honesty in fact and observance of fair dealing so as to constitute unconscionable commercial practices, in violation of the NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A, 56:8-2 et seq.

70.    Defendants acted wilfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

71.    As a proximate result of the acts of consumer fraud set forth above, Plaintiff(s) have purchased an unsafe product and incurred and will incur monetary expense and economic loss and the risk to themselves and members of their household that they would, by consuming Vioxx, thereby suffer harm as previously set forth herein.

Wherefore, plaintiffs demand judgment against defendant for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IV

### BREACH OF EXPRESS WARRANTY

72.    Plaintiffs epeat and incorporate by reference all paragraphs above as if fully set forth herein.

73.    Defendants placed Vioxx into the stream of commerce for sale and recommended its use to physicians, the FDA, United Kingdom regulators and consumers without adequately warning physicians, the FDA, United Kingdom regulators and consumers, including the Plaintiff(s), of the risks associated with the use of Vioxx.

74.    Defendants had a duty to exercise reasonable care in the research, development, design, formulation, testing, manufacture, inspection, labeling, packaging, distribution, marketing, promotion, sale and release of Vioxx, including a duty to:

a)      Ensure that the product did not cause the user unreasonably dangerous side effects;

b)      Warn of dangerous and potentially fatal side effects; and

c)      Disclose adverse material facts when making representations to physicians, the FDA, United Kingdom regulators and the public at large, including Plaintiff(s).

75.      When Plaintiffs' physicians(s) prescribed Vioxx and Plaintiff(s) made the decision to use Vioxx, both Plaintiffs' and their physicians reasonably relied upon the defendant and their agents to disclose known defects, risks, dangers and side effects of Vioxx.

76.      Plaintiffs' physician(s), the FDA, United Kingdom regulators and/or Plaintiff(s) had no knowledge of the falsity or incompleteness of the defendant's statements and representations concerning Vioxx when Plaintiffs' physician prescribed and/or otherwise provided Vioxx and Plaintiffs purchased and used Vioxx as researched, developed, designed, formulated, tested, manufactured, inspected, labeled, packaged, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by the defendant. Plaintiff(s) justifiably and detrimentally relied on the warranties and representations of defendant in the purchase and use of Vioxx.

77.      Defendants were under a duty to disclose the defective and unsafe nature of Vioxx to physicians, the FDA, United Kingdom regulators, consumers and users, such as Plaintiffs. Defendants had sole access to material facts concerning the defects, and defendant knew that physicians, the FDA, United Kingdom regulators and users, such as Plaintiffs, could not have reasonably discovered such defects.

78.      By the conduct alleged, defendant, their agents and employees expressly warranted to Plaintiffs and Plaintiffs' physician(s) that the products were merchantable and fit for the purpose intended, in violation of N.J.S.A. 12A:2-313 et seq.

79.    This warranty was breached because Vioxx was not safe and effective as a medication for arthritis and pain, as defendant had represented, and Plaintiff(s) were injured.

80.    As a direct result of defendant's conduct as aforesaid, Plaintiff(s) have suffered and continue to suffer serious and permanent physical and emotional injuries, have expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

Wherefore, plaintiffs demand judgment against defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT VI

### VIOLATION OF GENERAL BUSINESS LAW § 349

81.    Plaintiffs repeat and incorporate by reference each and every allegation set forth above as if fully set forth herein.

82.    Plaintiffs are, "persons" within the meaning of New York General Business Law § 349(h).

83.    Section 349(a) of New York's General Business Law provides:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

84.    Section 349(h) of New York's General Business Law empowers "[a]ny person who has been injured by reason of any violation of this section," to bring an action.

85.    At all relevant times defendant Merck was in the business of designing, manufacturing, distributing, supplying, marketing, advertising, promoting, and selling its prescription drug product, Vioxx, to consumers, including plaintiffs herein.

86.     Defendant Merck made untrue, materially deceptive or misleading representations of material facts and omitted and/or concealed material facts in product packaging, labeling, medical advertising, direct-to-consumer advertising, promotional campaigns and materials, sales, detailing, promoting, among other ways, regarding the safety and use of Vioxx. Furthermore, defendant Merck downplayed and/or understated the serious nature of the risks associated with Vioxx in order to increase the sales of Vioxx and secure a greater share of the COX-2 market.

87.     Defendant Merck concealed, omitted, or minimized the side effects of Vioxx or provided misinformation about adverse reactions, risks and potential harms from Vioxx and succeeded in persuading and inducing consumers to purchase and ingest Vioxx despite the lack of safety and the risk of adverse medical reactions, including serious cardiovascular and other adverse events.

88.     Defendant Merck's practice of promoting and marketing Vioxx created and reinforced a false impression as to the safety of Vioxx, thereby placing consumers at risk of serious and potentially lethal effects.

89.     Vioxx lacked appropriate warnings, and the packaging and labels used by defendant Merck were misleading, inaccurate, incomplete, and/or untimely.

90.     Defendant Merck's conduct constitutes deceptive acts or practices in the conduct of business, trade or commerce.

91.     Defendant Merck's deceptive acts and practices took place in the context of designing, marketing, distributing, and selling a prescription medication to the public, to consumers including the plaintiffs herein, and to the medical profession and scientific community, including physicians, pharmacists, and health care providers and therefore those deceptive acts and that conduct is consumer-oriented and affects the public interest.

92.   Defendant Merck's unlawful conduct constitutes unfair acts or practices that have the capacity to and that do deceive consumers.

93.   The promotion and release of Vioxx by defendant Merck into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts in violation of New York General Business Law § 349.

94.   Defendant Merck acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

95.   As a proximate result of the acts of consumer fraud set forth above, plaintiffs purchased and ingested an unsafe product, incurring monetary expense and the risk to themselves and members of their households that they would consume Vioxx and thereby suffer an increased risk of harms as previously set forth herein.

96.   As a direct and proximate result of the deceptive acts or practices of defendant Merck, plaintiffs sustained actual damages and injuries.

97.   By reason of the foregoing, defendant Merck is liable to each plaintiff in an amount to be proved at trial and further is liable to plaintiff for treble damages and attorneys fees.

## COUNT VI

## LOSS OF CONSORTIUM

98.   Plaintiffs repeat and incorporate by reference all paragraphs above as if fully set forth herein.

99.   By reason of the foregoing acts and/or omissions of defendant, the living plaintiffs who consumed Vioxx and his respective spouse, and the estate of (though its administrator or executor) and the wrongful death beneficiaries of the deceased Vioxx

consumer has (have) necessarily paid and has (have) become liable to pay for medical care, treatment, attendance and medications, and will necessarily incur further expenses of a similar nature in the future.

100.    By reason of the foregoing acts and/or omissions of defendant, the spouse of the living Plaintiffs who consumed Vioxx, and the wrongful death beneficiaries of the of the deceased Vioxx consumer has (have) lost and in the future will lose his deceased's consortium, comfort, companionship, services, society, support, guidance and advice.

Wherefore, plaintiffs demand judgment against defendant for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

## CONCLUSION

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, alternatively pray for judgment against Defendants as follows:

A.    Awarding Plaintiffs compensatory damages against defendant in an amount sufficient to fairly and completely compensate Plaintiffs for all damages;

B.    Awarding Plaintiffs treble damages against defendant so to fairly and completely compensate Plaintiffs for all damages, and to deter similar wrongful conduct in the future;

C. Awarding Plaintiffs punitive damages against defendant in an amount sufficient to

punish defendant for its wrongful conduct and to deter similar wrongful conduct in the future;

D.    Awarding Plaintiffs costs and disbursements, costs of investigations, attorneys' fees and all such other relief available under New York and New Jersey law;

E.      Awarding that the costs of this action be taxed to defendant; and

F.      Awarding such other and further relief as the Court may deem just and

proper.

Dated: New York, New York
        September 24, 2007

                                        _____
                                        Charles D. Cole, Jr.
                                        NEWMAN FITCH ALTHEIM MYERS, P.C.
                                        Attorneys for Plaintiffs
                                        14 Wall Street
                                        New York, New York 10005

                                        and

                                        Joseph C. Blanks, Esq.
                                        Post Office Drawer 999
                                        Doucette, Texas 75942

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
ANDERSON, MARGARET, et vir, ANDERSON,         :
JOHN, CAMPBELL, JOHN, et ux, CAMPBELL,        :
ELIZABETH, COLLINS, MARION,                   :
HAMILTON, WILLIAM, et ux, HAMILTON,           :
JANETTE, REID, HENRY, et ux, REID,            :    No.: _____
CAROLYN, WILLIAMSON, JOHN, et ux,             :
WILLIAMSON, MARGARET,                         :
                                              :
                                 Plaintiffs,  :
                                              :
                    -against-                 :
                                              :
MERCK & CO., INC., and MERCK, SHARP &         :
DOHME, LTD.,                                  :
                                              :
                                 Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANT MERCK SHARP & DOHME LIMITED'S CONSENT TO REMOVAL

Defendant Merck Sharp & Dohme Limited hereby consents to the removal by Merck &

Co., Inc. of the above-styled case, originally filed in the Supreme Court of the State of New York,

County of New York, to the United States District Court for the Southern District of New York.

In consenting to removal, Merck Sharp & Dohme Limited expressly reserves all defenses

including, but not limited to, lack of personal jurisdiction and improper service of process. Merck

Sharp & Dohme Limited is incorporated and has its principal place of business in the United

Kingdom. Merck Sharp & Dohme Limited does not do business in New York, and is

independently capitalized and has its own corporate structure.

Dated: November **20**, 2007

Respectfully submitted,

_____

**ATTORNEY-IN-CHARGE FOR
DEFENDANT MERCK SHARP & DOHME
LIMITED**

# Exhibit 3

FILED FOR RECORD

2006 SEP 29 P 4: 13

MELISSIE EVANS
DISTRICT CLERK
TYLER COUNTY, TEXAS
BY: _Denise Kaus_

CAUSE NO. 20,159

| | | |
|---|---|---|
| Michael Braid, et al | § | In The District Court |
| | § | |
| VS. | § | Of Tyler County |
| | § | |
| MERCK & CO., INC., and | § | ____ Judicial District Court |
| MERCK SHARP & DOHME, LTD. | § | |

## PLAINTIFFS' ORIGINAL PETITION

COME NOW all of the below-named Plaintiffs, complaining of Merck & Co., Inc. and Merck, Sharp & Dohme, Ltd..

Michael Braid
Linda Connolly, et ux, Mr. Connolly
George Daly
Ann Dunlop, et vir, James Dunlop
Jennifer Evans
David Hamilton, et ux, Ann Hamilton
Amanda Jane Harris
Philip Hart, et ux
Helen Hunter
Anthony James, et ux
Anthony Kendrick
Leon Locke, Indiv. and as Administrator of the Estate of, and pursuant to Tex. Civ. Prac. and Rem. Code §71.004(b), on behalf of and for the benefit of all the wrongful death beneficiaries of Greta Locke, Deceased
Steven Mill
Agnes Searle, et ux, Henry Searle
Robert Stark, et vir, Fiona Stark
Hazel Tew

The above-named plaintiffs are citizens of the United Kingdom who complain of and seek relief from the defendants named herein. The following plaintiffs are citizens of Ireland who complain of and seek relief from the defendants named herein:

Mary Hayes, et ux, Niall J. Hayes

a.      Merck & Co., Inc. is a New Jersey corporation with its principal place of business in New Jersey. It may be served though its registered agent, C.T. Corporate System; 350 N. St. Paul St.; Dallas, Texas 75201..

1

M005A33054

b.     Merck, Sharp & Dohme, Ltd. is a U.K. entity which is the *alter ego* of Merck & Co., Inc. or a division of the latter, or a wholly owned and controlled subsidiary of the latter with its principal place of business in the U.K. but doing business in Texas or having committed torts in Texas at all relevant times. It is, therefore, a nonresident who engages in business in this state and is required to maintain a resident agent but has not designated or maintained a resident agent for service of process or who does not maintain a regular place of business in this state or a designated agent for service of process. Because this proceeding arises out of business done in this state and to which the nonresident is a party, the Secretary of State is this defendant's agent for service of process. The Secretary of State, upon being served with duplicate copies of process for this nonresident, is requested to serve this defendant by registered mail, return receipt requested at its principal place of business and home office at: Merck, Sharp & Dohme, Ltd., Hertford Rd.; Hoddesdon; Hertfordshire, England, EN1 19BU, The United Kingdom.

1.     The appropriate Discovery Plan for this action will be under Track 3.

A.     The court has jurisdiction of this action. The amount in controversy is within the jurisdictional limits of the court. Venue is permitted in this county. There is incomplete diversity of citizenship between the plaintiffs and the defendants, the plaintiffs and defendant Merck, Sharp & Dohme, Ltd. are aliens. No claim arising under federal law or the Constitution is raised, nor is there a claim raised that gives rise to federal jurisdiction under any other theory.

B.     The requirements of Section 71.031 TEX.CIV.PRAC.& REM.CODE are met. This action is begun within the time provided by the laws of the foreign state in which the wrongful acts, neglect, and default took place. The U.S. has equal treaty rights with the countries of which the plaintiffs are citizens. As made clear below, the foreign state in which wrongful acts took place, New Jersey, as well as this state, gives a right to maintain an action for damages for each death or injury alleged.

C.     Each of the first-named plaintiffs now living consumed the drug Vioxx™, also known as Rofecoxib (hereafter "the Drug" or "the Drugs") and suffered debilitating and permanently injurious ill effects from the Drug. The spouse of each plaintiff now living sustained losses as a result of the Drug-related injury of the respective spouse. As explained below, these plaintiffs seek money damages for the injuries of which the Drug was the or a proximate, or producing, or legal cause.

D.     Each of the Deceased persons named above consumed the Drug and suffered a fatal reaction as a consequence of that consumption. The administrator/executor of each estate of a deceased Drug consumer named above seeks money damages on

M005A33055

behalf of the estate of the administrator's/executor's respective decedent in a survival action as explained below. The administrator/executor also sues on behalf of all the wrongful death beneficiaries of the deceased, seeking money damages for the loss of society, mental anguish and grief, loss of support, and all other relief the law allows for the wrongful death of their respective decedent.

E.    Each plaintiff named herein seeks just compensation for each plaintiff's respective damages caused by the negligence and other tortious conduct of the defendants, their defective and unreasonably dangerous product (the Drug), and the violations by the defendants of applicable consumer fraud statutes.

2.    As more particularly pleaded below, each plaintiff maintains that the pharmaceutical drug, Vioxx, is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings as to the dangers associated with its use.

### PARTIES – PLAINTIFF

3.    The living Plaintiffs who consumed Vioxx were injured as a result of his or her use of Vioxx. The deceased consumers of Vioxx whose estates are (through their respective administrators or excutors) plaintiffs were injured and expired as a result of his or her use of Vioxx. The spouses of the living Plaintiffs who consumed Vioxx and the wrongful death beneficiaries of the deceased consumers of Vioxx were injured as a result of the consumer's use of Vioxx. All Plaintiffs, therefore, seek, to the extent denoted herein and allowed by applicable law, all such compensatory damages, punitive damages, all ascertainable economic losses, including, if applicable, survival damages, wrongful death damages, treble damages, attorneys' fees, reimbursement of the cost of obtaining Vioxx, reimbursement for all past, present and future health and medical care costs related to Vioxx, as well as *per quod* and derivative damages.

4.    Plaintiffs are specifically identified in the caption above and their names are incorporated in the body of this pleading by reference as if set forth again.

### DEFENDANTS

M005A33056

5.    The Defendant, Merck & Co., Inc. (hereinafter "Merck"), is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

6.    At all times relevant hereto, Defendant Merck was and continues to be engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug, Vioxx.

7.    a.    Defendant, Merck Sharp & Dohme, Ltd. is a corporation organized under the laws of the United Kingdom with its principal place of business in Hertfordshire, England, which at all times material hereto manufactured, tested, packaged, formulated, designed, sold, distributed, licensed, performed research and development regarding, marketed, and labeled Vioxx in the United Kingdom.

b.    Merck Sharp & Dohme, Ltd. personnel attended Merck meetings in New Jersey regarding Vioxx and participated in telephone and/or video conference calls with Merck personnel in New Jersey regarding Vioxx. Merck Sharp & Dohme, Ltd.documents regarding Vioxx are currently maintained by Merck and/or Merck's agents in New Jersey.

c.    Merck utilized Merck Sharp & Dohme, Ltd. research and development work regarding Vioxx in Merck's communication with the United States Food and Drug Administration ("FDA") in order to market Vioxx in New Jersey, Texas, and elsewhere.

d.    Merck Sharp & Dohme, Ltd. utilized the decision-making and the marketing experience and the regulatory experience of Merck personnel in New Jersey in order to market and label Vioxx in the United Kingdom.

e.    Merck profited financially from the sale of Vioxx in the United Kingdom.

M005A33057

5

f.    Merck controls Merck Sharp & Dohme, Ltd. marketing and labeling and regulatory work in the United Kingdom regarding Vioxx.

## FACTS COMMON TO ALL COUNTS

8.    Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

9.    Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

10.    Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23 , 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

11.    Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/ml and 25 mg/ml, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

12.    On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

M005A33058

13.    At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

14.    The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

15.    Defendant Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PU13s During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

16.    The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

17.    In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension.

18.    Defendants continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and

M005A33059

concealment. Defendants engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced defendants' financial stability to the detriment of its consumers. As a result of defendants' scheme, they reaped billions of dollars in profit and appropriated a large share of the market in the United States and The United Kingdom.

19.    Defendants continued to profit from its scheme by withholding information from Plaintiff, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

20.    On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what Merck had concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. See Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22129, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

21.    In the JAMA study, the authors stated that "by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic

M005A33060

cardiovascular events." Id. at 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclinithromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, Journal of Science, V. 296:539-541, Apr. 19, 2002.

22.     On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."

23.     The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (MAID), Naprosyn (naproxen).

24.     The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions:"

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented

M005A33061

Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1,2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion. A written statement of your intent to comply with "1" and "2" above.

25.     On April 11 , 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

26.     The revised labeling further states that the administration of Vioxx 50 mg, was associated with a higher incidence of gastrointestinal symptoms.

Clinical Studies in OA and BA with VIOXX 50 mg (Twice the highest dose recommended for chronic use) In DA and RA clinical trials which contained VIOXX 12.5 et 25 mg as well as VIOXX 50 mg, VIOXX 50 mg DD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious' adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

M005A33062

27.    Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.

28.    The revised "Patient Information" sheet does not add any information about the results of the VIGOR study.

29.    The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

30.    Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal side effects of Vioxx.

31.    Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious gastrointestinal side effects, defendants have concealed and/or downplayed the dangers associated with Vioxx. In its 2001 Annual Report, for example, Defendant Merck states: The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx . . . The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

32.    Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Merck fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

"Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR *, FOSAMAX and SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

"Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has

M005A33063

become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter. A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

33.    In October 1997, Merck sponsored a study lead by Dr. Garrett Fitzgerald, of the University of Pennsylvania, known as Protocol 023 a.k.a. "the Fitzgerald Study." During this study, Dr. Fitzgerald observed that patients taking VIOXX™ had significantly lower levels of prostacyclin metabolites in their urine than patients taking placebo. Scientists believe that prostacyclin in the bloodstream inhibits platelet aggregation -- i.e. blood clotting. Dr. Fitzgerald hypothesized that if VIOXX™, as a COX-2 inhibitor was causing reduced prostacyclin levels in blood vessels, as well as urine, then COX-2 inhibitors might result in increased blood clots and associated cardiovascular events. Merck Board of Scientific Advisors, an independent group of scientists, in response to the Fitzgerald hypothesis, recommended that Merck implement a procedure in all future VIOXX™ studies that would enable the company to develop data on a pooled basis to better understand future cardiovascular events during the clinical trials.

34.    Merck never engaged in the studies recommended by the FDA to properly evaluate the efficacy of VIOXX™. Merck simply avoided conducting other Outcomes studies to determine if VIOXX™ had improved gastrointestinal ("GI") benefits because of the fear of demonstrating the possibility of increased cardiovascular ("CV") events. Internal e-mails demonstrate an attempt by Merck employees to manipulate studies and conceal safety information on VIOXX™.

M005A33064

35.    In January of 1999, Merck began the VIOXX™ Gastrointestinal Outcomes Research ("VIGOR') trial to determine whether VIOXX™ reduced the risk of PUBs relative to naproxen. The VIGOR trial had approximately 8,100 patients and the "unblended" results of the study were released in March of 2000. Patients requiring aspirin for cardiac reasons were excluded from the trial. There were fewer CV thrombotic events in patients taking naproxen than in patients taking VIOXX™. Patients taking VIOXX™ suffered more than twice as many serious CV events and five times as many heart attacks than patients taking the drug naproxen.

36.    In September 2001, the FDA issued a Warning Letter to Merck's then Chief Executive Officer, Raymond V. Gilmartin. The letter stated Merck's promotional activities in relation to VIOXX™ were "false, lacking in fair balance, or otherwise misleading."

37.    After learning of the VIGOR results, Merck began to design a large study of VIOXX™. In 2001, Merck began a study involving three long-term trials in patients at risk of colon or prostate cancer. One of these trials was a three-year study to determine if VIOXX™ could prevent recurrent colon polyps and was known as APPROVe. The preliminary results of APPROVe showed an increased rate of adverse CV events in study participants taking 25 mg VIOXX™ as compared to patients receiving a placebo. On September 23, 2004, the External Safety Monitoring Board for APPROVe delivered preliminary results and recommended that Merck stop the study because of the number of adverse cardiovascular events. On September 30, 2004, Merck withdrew VIOXX™ from the worldwide market.

38.    Despite the foregoing, defendants continued to represent to consumers that Vioxx is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. Defendants downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

M005A33065

## COUNT I

**PRODUCTS LIABILITY - DEFECTIVE DESIGN (N.J.S.A. 2A:58C-2 et seq.)**

39.    Plaintiffs and their Decedents repeat and incorporate by reference all other paragraphs of this Master Complaint as if fully set forth herein.

40.    Defendants are the researchers, developers, designers, labelers, manufacturers, distributors, formulators, packagers, marketers, promoters, suppliers and sellers of Vioxx, which is defective and unreasonably dangerous to consumers.

41.    Vioxx is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation. Vioxx is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other nonsteroidal anti-inflammatory medicines and similar drugs on the market and is more dangerous than ordinary consumers can reasonably foresee.

42.    The defective condition of Vioxx renders it unreasonably dangerous, and Vioxx was in this defective condition at the time it left the hands of the defendants. Vioxx was expected to and did reach consumers, including Plaintiffs and their Decedents, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce. Vioxx sold in The United Kingdom was the same as Vioxx sold in New Jersey, in Texas, and elsewhere in the United States.

43.    Plaintiffs and their Decedents were unaware of the significant hazards and defects in Vioxx. Vioxx was unreasonably dangerous in that it was more dangerous than would be reasonably contemplated by the ordinary user. During the period that Plaintiffs and their Decedents were taking Vioxx, the medication was being utilized in a manner that was intended by defendants. At the time Plaintiffs and their Decedents received and consumed Vioxx, it was represented to be safe and free from latent defects.

M005A33066

44.    Defendants are strictly liable to Plaintiffs and their Decedents for designing, formulating, packaging, marketing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of defendants because of the design defects.

45.    Defendants knew or should have known of the danger associated with the use of Vioxx, as well as the defective nature of Vioxx, but continued to design, manufacture, formulate, sell, distribute, market, promote and/or supply Vioxx in a knowing and/or reckless fashion so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

46.    As a direct and proximate consequence of the design defect and defendants' misconduct as set forth herein, Plaintiffs and their Decedents have suffered and the living Plaintiffs continue to suffer serious and permanent physical and emotional injuries, have expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

WHEREFORE, Plaintiff (s) demands judgment against defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT II

## PRODUCTS LIABILITY - FAILURE TO WARN (N.J.S.A. 2A:58C-2 et seq.)

47.    Plaintiffs and their Decedents repeat and incorporate by reference all other paragraphs of this Master Complaint as if fully set forth herein.

48.    Defendants researched, developed, formulated, packaged, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Vioxx, and in the

M005A33067

course of same, directly advertised or marketed the product to the FDA, United Kingdom regulators, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

49.    Vioxx was under the exclusive control of the defendants as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of Vioxx, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury with such use.

50.    Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx so that no medical care provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

51.    Defendants failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Vioxx posed serious and potentially life-threatening side effects and complications with respect to which full and proper warning accurately and fully reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA, United Kingdom regulators, and the public, including the Plaintiffs and their Decedents.

52.    Vioxx, which was researched, developed, formulated, packaged, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by defendants, was defective due to inadequate post-marketing warnings and/or instruction because, after defendants knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx, defendants failed to provided adequate warnings to medical care providers, the FDA, United Kingdom regulators and the consuming public, including Plaintiff( s), and continued to promote Vioxx aggressively.

M005A33068

53.    As direct and proximate result of the conduct of defendants as aforesaid, Plaintiffs and their Decedents have suffered and the living Plaintiffs continue to suffer serious and permanent physical and emotional injuries, have expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

WHEREFORE, Plaintiffs and their Decedents demand judgment against defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III

### NEW JERSEY CONSUMER FRAUD ACT (N.J.S.A. 56:8-2 et seq.)

54.    Plaintiffs and their Decedents repeat and incorporate by reference all other paragraphs of this Master Complaint as if fully set forth herein.

55.    Prescription drugs such as Vioxx are "merchandise," as that term is defined by the Consumer Fraud Act ("Act") N.J.S.A. 56:8-1 et seq. 56. Defendants are the researchers, developers, designers, testers, manufacturers, formulators, packagers, inspectors, labelers, distributors, marketers, promoters, sellers and/or otherwise released Vioxx into the stream of commerce.

57.    Defendants knew or should have known that the use of Vioxx x causes serious and life threatening injuries but failed to warn the public, including Plaintiffs and their Decedents, of same.

58.    In violation of the Act, defendants made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts from Plaintiffs and their Decedents in product packaging, labeling, medical advertising, direct-to-consumer advertising, promotional campaigns and materials, among other ways, regarding the safety and use of Vioxx. Moreover, defendants downplayed and/or understated the serious nature of the risks associated with Vioxx in order to

M005A33069

increase the sales of Vioxx and secure a greater share of the COX-2 market, and made efforts to control medical opinion by intimidation and by funding misleading literature and professional presentations.

59.     Defendants' statements and omissions were undertaken with the intent that the FDA, United Kingdom regulators, physicians, and consumers, including the Plaintiffs and their Decedents, would rely on the defendants' statements and/or omissions.

60.     Defendants knew of the growing public acceptance of the misinformation and misrepresentations regarding the safety and efficacy of Vioxx but remained silent because defendants' appetite for significant future profits far outweighed their concern (if any) for the health and safety of the Plaintiffs and their Decedents.

61.     The physicians of Plaintiffs and their Decedents' prescribed and/or otherwise provided Plaintiffs and their Decedents with Vioxx, and they consumed Vioxx, primarily for personal and family reasons and suffered and will suffer ascertainable losses of money as a result of the defendants' use or employment of the methods, acts, or practices alleged herein.

62.     The aforesaid promotion and release of Vioxx into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentations, and/or the knowing concealment, suppression, or omission of material facts with the intent that others would rely upon such concealment, suppression or omission in connection with the sale or advertisement of such merchandise or services by defendants, in violation of the New Jersey Consumer Fraud Act., N.J.S.A. 56:8-1 et seq.

63.     Defendants concealed, omitted, or minimized the side effects of Vioxx or provided misinformation about adverse reactions, risks and potential harms from Vioxx and succeeded in persuading consumers to purchase and ingest Vioxx despite the

M005A33070

lack of safety and the risk of adverse medical reactions, including cardiovascular events and gastrointestinal effects.

64.   Defendants' practice of promoting and marketing Vioxx created and reinforced a false impression as to the safety of Vioxx, thereby placing consumers at risk of serious and potential lethal effects.

65.   Vioxx lacked appropriate warnings, and the packaging and labels used by defendants were misleading, inaccurate, incomplete, and/or untimely.

66.   Defendants violated their post-manufacture duty to warn which arose when they knew, or with reasonable care should have known, that Vioxx was injurious and sometimes fatal.

67.   At the time when consumers purchased and ingested Vioxx, defendants intended that others would rely upon the concealment, suppression or omission of the risks of ingesting Vioxx.

68.   Defendants' actions in connection with manufacturing, distributing, and marketing of Vioxx as set forth herein evidence a lack of good faith, honesty in fact and observance of fair dealing so as to constitute unconscionable commercial practices, in violation of the NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A, 56:8-2 et seq.

69. Defendants acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

70.   As a proximate result of the acts of consumer fraud set forth above, Plaintiffs and their Decedents have purchased an unsafe product and incurred and will incur monetary expense and economic loss and the risk to themselves and members of their household that they would, by consuming Vioxx, thereby suffer harm as previously set forth herein.

WHEREFORE, Plaintiffs and their Decedents demand judgment against defendants for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

M005A33071

## COUNT IV

### BREACH OF EXPRESS WARRANTY

71.    Plaintiffs and their Decedents repeat and incorporate by reference all other paragraphs of this Master Complaint as if fully set forth herein.

72.    Defendants placed Vioxx into the stream of commerce for sale and recommended its use to physicians, the FDA, United Kingdom regulators and consumers without adequately warning physicians, the FDA, United Kingdom regulators and consumers, including the Plaintiffs and their Decedents, of the risks associated with the use of Vioxx.

73.    Defendants had a duty to exercise reasonable care in the research, development, design, formulation, testing, manufacture, inspection, labeling, packaging, distribution, marketing, promotion, sale and release of Vioxx, including a duty to:

   a)    Ensure that the product did not cause the user unreasonably dangerous side effects;

   b)    Warn of dangerous and potentially fatal side effects; and

   c)    Disclose adverse material facts when making representations to physicians, the FDA, United Kingdom regulators and the public at large, including Plaintiffs and their Decedents.

74.    When the physicians of Plaintiffs and their Decedents' prescribed Vioxx and they made the decision to use Vioxx, both Plaintiffs and their Decedents and their physicians reasonably relied upon the defendants and their agents to disclose known defects, risks, dangers and side effects of Vioxx.

75.    The latter physician(s), the FDA, United Kingdom regulators and/or Plaintiffs and their Decedents had no knowledge of the falsity or incompleteness of the defendants' statements and representations concerning Vioxx when the physicians prescribed and/or otherwise provided Vioxx and Plaintiffs and their Decedents

M005A33072

purchased and used Vioxx as researched, developed, designed, formulated, tested, manufactured, inspected, labeled, packaged, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by the defendants. Plaintiffs and their Decedents justifiably and detrimentally relied on the warranties and representations of defendants in the purchase and use of Vioxx.

76.   Defendants were under a duty to disclose the defective and unsafe nature of Vioxx to physicians, the FDA, United Kingdom regulators, consumers and users, such as Plaintiffs and their Decedents,  Defendants had sole access to material facts concerning the defects, and defendants knew that physicians, the FDA, United Kingdom regulators and users, such as Plaintiffs and their Decedents, could not have reasonably discovered such defects.

77.   By the conduct alleged, defendants, their agents and employees expressly warranted to Plaintiffs and their Decedents and their physicians that the products were merchantable and fit for the purpose intended, in violation of N.J.S.A. 12A:2-313 et seq.

78.   This warranty was breached because Vioxx was not safe and effective as a medication for arthritis and pain, as defendants had represented, and Plaintiffs and their Decedents were injured.

79.   As a direct result of defendants conduct as aforesaid, Plaintiffs and their Decedents have suffered and continue to suffer serious and permanent physical and emotional injuries, have expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally and economically injured.

WHEREFORE, Plaintiffs and their Decedents demand judgment against defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

M005A33073

# COUNT V

## WRONGFUL DEATH AND SURVIVAL ACTION

80.    Plaintiffs and their Decedents repeat and incorporate by reference all other paragraphs of this Master Complaint as if fully set forth herein.

81.    As a result of the acts and/or omissions of the defendants as set forth herein, plaintiffs' respective Decedents suffered serious emotional and bodily injuries prior to and resulting in his/her death.

82.    Plaintiffs (as Decedent's surviving relative and wrongful death beneficiaries (spouse, child, or parent), are entitled to recover damages as Decedent would have if he/she were living, as a result of the acts and/or omissions of the defendants as specifically pled herein pursuant to N.J.S.A. 2A:15-3, the NEW JERSEY SURVIVAL ACT.

83.    Plaintiffs are entitled to recover punitive damages and damages for the pain and suffering caused to their respective Decedent from the acts and omissions of the defendants as specifically pled herein, including, without limitation, punitive damages pursuant to N.J.S.A. 2A: 15-3.

84.    Plaintiffs, on behalf of their respective Decedent's estate, seek damages compensable under the Survival Act (or any successor statute) against the defendants. Plaintiffs, in his/her/their own right, seek damages compensable under the Survival Act (or any successor statute) against the defendants.

85.    Plaintiffs are entitled to recover damages for the death of plaintiffs' respective decedent, in their own right and (or as representative of the heirs and as administrator or executor of the estate of the deceased) and seek damages under the NEW JERSEY WRONGFUL DEATH ACT, N.J.S.A. 31-1 et seq.

WHEREFORE, Plaintiffs demand Judgment on this Count against defendants and in the alternative for the damages resulting from the death of their respective decedent; including, without limitation, Decedent's pecuniary injury, together with all relevant

M005A33074

hospital, medical and funeral expenses as specifically provided for under the NEW JERSEY WRONGFUL DEATH ACT, N.J.S.A. 31-1 et seq., as well as compensatory damages, treble damages, exemplary damages, attorneys' fees, interest and costs of suit, and punitive damages as provided for under the New Jersey Survival Act, N.J.S.A. 2A: 15-3 et seq., and all such other relief as the Court deems just.

### COUNT VI

### LOSS OF CONSORTIUM

86.    Plaintiffs and their Decedents repeat and incorporate by reference all other paragraphs of this Master Complaint as if fully set forth herein.

87.    By reason of the foregoing acts and/or omissions of defendants, the living plaintiffs who consumed Vioxx and his respective spouse, and the estate of (though its administrator or executor) and the wrongful death beneficiaries of the deceased Vioxx consumer have necessarily paid and have become liable to pay for medical care, treatment, attendance and medications, and will necessarily incur further expenses of a similar nature in the future.

88.    By reason of the foregoing acts and/or omissions of defendants, the spouse of the living Plaintiffs who consumed Vioxx, and the wrongful death beneficiaries of the  deceased Vioxx consumers have lost and in the future will lose his deceased's consortium, comfort, companionship, services, society, support, guidance and advice.

WHEREFORE, Plaintiffs demand judgment against defendants for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

A.    Awarding Plaintiffs compensatory damages against defendants in an amount sufficient to fairly and completely compensate Plaintiffs for all damages;

M005A330/5

B.    Awarding Plaintiffs treble damages against defendants so to fairly and completely compensate Plaintiffs for all damages, and to deter similar wrongful conduct in the future;

C.    Awarding Plaintiffs punitive damages against defendants in an amount sufficient to punish defendants for its wrongful conduct and to deter similar wrongful conduct in the future;

D.    Awarding Plaintiffs costs and disbursements, costs of investigations, attorneys' fees and all such other relief available under New Jersey law;

E.    Awarding that the costs of this action be taxed to defendants; and

F.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:

Post Office Drawer 999                    Respectfully submitted,
DOUCETTE, TEXAS 75942
(409)837-9707 FAX 837-9045
Texas Bar No. 02456770                    Joseph C. Blanks
                                          Attorney for Plaintiffs

M005A33076

*Please Date Stamp &
Return*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# LUFKIN DIVISION



| | | |
|---|---|---|
| MICHAEL BRAID, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| | § | |
| MERCK & CO., INC., and | § | JURY TRIAL REQUESTED |
| MERCK SHARP & DOHME, LTD., | § | |
| | § | |
| Defendants. | § | |

## <u>NOTICE OF REMOVAL OF DEFENDANT MERCK & CO., INC.</u>

Pursuant to 28 U.S.C. § 1441, defendant Merck & Co., Inc. ("Merck") hereby removes this action, which has been pending as Cause No. 20, 159 in the District Court of Tyler Couty, Texas, to the United States District Court for the Eastern District of Texas, Lufkin Division. Merck anticipates that this case will be transferred to the Eastern District of Louisiana as a "tag-along" action to the Multidistrict Litigation ("MDL") proceeding established by the Judicial Panel on Multidistrict Litigation ("JPML") to coordinate product liability litigation relating to the prescription medication Vioxx® ("Vioxx").

In support of its notice of removal, Merck respectfully states as follows:

1.      This is a product liability action involving the prescription medication Vioxx. On October 16, 2006, Merck was served with Plaintiffs' Original Petition ("Petition" or "Pet.") alleging various Vioxx-related injuries. The thrust of Plaintiffs' allegations is that Merck knew that Vioxx had adverse health effects, yet concealed this information from the Plaintiffs, healthcare providers, and the public. (Pet. ¶¶ 1,2.)

31223800.1

M008A60227

2.     As set forth below, removal of this case is proper because the $75,000 jurisdictional threshold is amply satisfied, and the only non-diverse defendant, Merck Sharp & Dohme Limited ("MSD"), a British company over which the Texas courts have no personal jurisdiction, was improperly joined.

## I.     MERCK HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

3.     Merck was served with the Petition on October 16, 2006.  Upon information and belief, the Petition was served on October 18, 2006, on the Texas Secretary of State as the agent for MSD pursuant to Texas Civil Practice and Remedies Code Section 17.044.  Accordingly, this Notice of Removal is timely pursuant to 28 U.S.C. § 1446(b) because it is filed within thirty days of service of the defendant first served with the Petition.  *Brown v. Demco, Inc.*, 792 F.2d 478, 481 (5th Cir. 1986).

4.     Pursuant to 28 U.S.C. § 1446(d), Merck is filing written notice of this removal with the clerk of the state court in which the action is currently pending.  Copies of the Notification of Removal, together with this Notice of Removal, are being served upon Plaintiff's counsel pursuant to 28 U.S.C. § 1446(d).

5.     The United States District Court for the Eastern District of Texas, Lufkin Division, embraces Tyler County, where the state court action is now pending.  Therefore, this Court is a proper venue for this action pursuant to 28 U.S.C. §§ 124(c)(5) and 1441(a).

6.     Defendant Merck Sharp & Dohme Limited consents to and joins in this Removal.[1]  *See* Defendant Merck, Sharp & Dohme Limited's Consent to Removal (attached as Exhibit H).

---

[1]     By joining in this Removal, Defendant Merck Sharp & Dohme Limited does not waive its objections to service of process or personal jurisdiction.  *Cowen v. Am. Med. Sys.*, 411 F. Supp. 2d 717, 720 (E.D. Mich. 2006) (citing *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("The Supreme Court held over 75 years ago

M0008A60228

7.    Pursuant to the Eastern District of Texas Local Rule CV-81, Merck is filing this Notice of Removal, which is accompanied by the following:

A.    A Civil Cover Sheet

B.    All executed process in this case (Exhibit A);

C.    Pleadings asserting causes of action, e.g., petitions, counterclaims, cross-actions, third-party actions, interventions and all answers to such pleadings (Exhibit B);

D.    All orders signed by the state judge (none);

E.    The docket sheet (Exhibit C);

F.    An index of matters being filed (Exhibit D); and

G.    A complete list of attorneys involved in the action being removed, including each attorney's bar number, address, telephone number and party or parties represented by him/her; a list of all parties in the case, their party type (e.g., plaintiff, defendant, intervenor, receiver, etc.) and current status of the removed case (pending, dismissed); a record of which parties have requested trial by jury; and the name and address of the court from which the case is being removed (Exhibit E).

## II.    REMOVAL IS PROPER IN THIS CASE.

### A.    The Amount in Controversy Requirement Is Satisfied.

8.    It is apparent from the face of the Petition that each Plaintiff seeks recovery separately of an amount in excess of $75,000, exclusive of costs and interest. *See, e.g., De Aguilar v. Boeing Co.*, 11 F.3d 55, 57 (5th Cir. 1993) (affirming denial of remand where it was "facially apparent that damages sought by the plaintiffs . . . exceed[ed]" the statutory amount in controversy).  Each plaintiff alleges injuries related to the ingestion of Vioxx. (Petition ¶¶ 1,2, 3.)  Specifically, plaintiffs allege that they (1) "consumed Vioxx [and] were injured as a result" or (2) that "plaintiffs were injured and expired as a result of his or her use of Vioxx" or (3) that

that defendant does not waive objections to service of process or personal jurisdiction by removing a state court

M008A69229

plaintiffs are "spouses of the living Plaintiffs" injured as a result of the use of Vioxx or are "wrongful death beneficiaries of the deceased consumers of Vioxx." (Petition ¶ 3.) Accordingly, plaintiffs seek, among other things, and without limitation: 1) compensatory damages for, *inter alia*, physical and emotional injuries, past and future medical expenses; 2) past and future economic loss; 3) loss of consortium; and 4) exemplary damages. (Petition ¶¶ 46, 53, 70, 79, 85, 88.) Federal district courts in Texas have found that cases with similar allegations satisfy the amount-in-controversy requirement. *See, e.g., Matney v. Wenger Corp.*, 957 F. Supp. 942, 943 (S.D. Tex. 1997) (holding that a products liability complaint asserting claims for personal injury, past and future medical expenses, mental anguish, and exemplary damages met the amount-in-controversy threshold); *Cross v. Bell Helmets USA*, 927 F. Supp. 209, 213-14 (E.D. Tex. 1996) (denying remand and noting that "[i]n today's legal climate, whenever exemplary damages are sought in a products liability case from a corporate defendant, [the statutory minimum for diversity jurisdiction ($50,000 in 1996)] certainly is not a high-end award").

9.    In addition, federal courts in Texas and around the country have ruled that federal diversity jurisdiction exists in similar actions alleging personal injuries caused by Vioxx. *See, e.g., Morgan v. Merck & Co.*, No. 3:03cv435WS (S.D. Miss. Mar. 29, 2004); *Benavidez v. Merck & Co.*, No. L-03-134 (S.D. Tex. Apr. 6, 2004); *Stubblefield v. Merck & Co.*, Civ. No. H-02-3139 (S.D. Tex. Oct. 8, 2002); *Zeedyk v. Merck & Co.*, No. 02-C-4203 (N.D. Ill. August 30, 2002); *Abrusley v. Merck & Co.*, No. 02-0196 (W.D. La. June 18, 2002); *Jones v. Merck & Co.*, Civ. No. 02-00186 (D. Haw. June 5, 2002). These courts were all presented with complaints seeking actual damages for injuries caused by Vioxx, and all found that the requirements for federal diversity jurisdiction, including the amount in controversy, were satisfied.

---

action to federal court.").

31223800.1                                    4

M008A60230

**B.**    **There Is Complete Diversity As Between Plaintiffs and All Properly Joined Defendants.**

10.    There is complete diversity between Plaintiffs and Merck.    *See* 28 U.S.C. § 1332(a)(2).

11.    Plaintiffs listed at Exhibit F to this Removal Notice are citizens of the United Kingdom. (*See* Pet. 7.) Plaintiffs listed at Exhibit G to this Removal Notice are citizens of Ireland. (*See* Pet. 7.) Plaintiffs do not allege any alternative state of residence or citizenship. Accordingly, upon information and belief, the United Kingdom and Ireland are foreign states in which Plaintiffs are domiciled and, therefore, the foreign states of which Plaintiffs are citizens for purposes of determining diversity.

12.    Merck is, and was at the time this suit was commenced, a corporation organized under the laws of the State of New Jersey (Pet. ¶ 1.b), with its principal place of business in New Jersey, and therefore is a citizen of New Jersey for purposes of determining diversity. 28 U.S.C. § 1332(c)(1).

13.    Upon information and belief, MSD is and was at the time this suit was commenced a corporation with its principal place of business in the United Kingdom. (Pet. ¶ 1.b.) However, because MSD was improperly joined,[2] its citizenship must be ignored for removal purposes. *See, e.g., Heritage Bank v. Redcom Labs., Inc.,* 250 F.3d 319, 323 (5th Cir. 2001) (improper joinder of a non-diverse defendant will not operate to defeat diversity jurisdiction).

---

[2]    Courts historically have called this the "fraudulent joinder" doctrine. However, in *Smallwood v. Illinois Central Ry. Co.,* 385 F.3d 568, 571 n.1 (5th Cir. 2004) (en banc), the Fifth Circuit Court of Appeals adopted the term "improper joinder" as being more consistent with related statutory language. Merck, consequently, uses the new terminology in this Removal.

M0008A60231

**C.    MSD is Improperly Joined.**

14.    A defendant is improperly joined and should be ignored for purposes of assessing diversity if "there is no possibility that the plaintiff will be able to establish a cause of action against the [nondiverse] defendant in state court or . . . there has been outright fraud in the plaintiff's pleadings of jurisdictional facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). One example of improper joinder occurs where the plaintiff names a non-diverse defendant over which the court cannot exercise personal jurisdiction. *See, e.g., Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1493 & 1494–95 (5th Cir. 1993) (observing that complete diversity exists where "there was 'no possibility'" that [the Plaintiffs] could establish that the court had personal jurisdiction over the foreign defendants").[3]

15.    That is precisely the case here. Because Texas courts cannot exercise personal jurisdiction over MSD, its citizenship should be disregarded for purposes of assessing diversity jurisdiction.

16.    Texas courts "may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Texas long-arm statute are satisfied." *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996); *see* U.S. Const. amend. XIV; Tex. Civ. Prac. & Rem. Code § 17.042 (Vernon 1997); *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 413–14 (1984). For the reasons set forth below, the Texas courts cannot exercise personal jurisdiction over MSD and therefore, MSD is improperly joined as a defendant.

17.    There are two requirements for Texas courts to exercise personal jurisdiction over MSD, a nonresident defendant: (1) MSD must be amenable to service of process under Texas'

long-arm statute; and (2) the assertion of personal jurisdiction over MSD must be consistent with the federal and state constitutional guarantees of due process. *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.041–.069 (Vernon 1997 & Supp. 2006). Because courts have interpreted the Texas long-arm statute to reach to the extent of the Fourteenth Amendment's due process clause, the requirements of the Texas constitutional guarantees of due process are satisfied "if the exercise of personal jurisdiction comports with federal due process limitations." *Guardian Royal*, 815 S.W.2d at 226; *see Electrosource, Inc.*, 176 F.3d at 871; *CSR, Ltd.*, 925 S.W.2d at 594; *Schlobohm*, 784 S.W.2d at 357; *see also U-Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977). Accordingly, the Court need only determine whether subjecting the non resident defendant to suit in Texas would offend the due process clause of the Fourteenth Amendment. *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999); *Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1495-96 (5th Cir. 1993) (citing *Aviles v. Kunkle*, 978 F.2d 201, 204 (5th Cir. 1992) and *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990)) ("Because the Texas long arm statute grants Texas courts the power to exercise jurisdiction whenever constitutional, the sole question before the district court was whether the district court could constitutionally exercise jurisdiction over the foreign defendants.").

18.    Federal due process requirements are satisfied when personal jurisdiction is asserted over a nonresident defendant that has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (*quoting Milliken v. Meyer*, 311

---

3    *Villar* was reversed in part on other grounds by *Marathon Oil Co. v. Ruhrgas*, 145 F.3d 211, 221-22 (5th Cir. 1998) (en banc). However, *Marathon Oil* was in turn reversed by the Supreme Court in *Ruhrgas v. Marathon*

MODBA60233

U.S. 457, 463 (1940)); *see Electrosource, Inc.*, 176 F.3d at 871; *CRS, Ltd.*, 925 S.W.2d at 594. A nonresident defendant's contacts with the forum state can give rise to either specific or general jurisdiction. *CRS, Ltd.*, 925 S.W.2d at 595.

19.    For the reasons stated below, MSD's contacts with Texas do not give rise to either specific or general jurisdiction. Moreover, it would offend the traditional notions of fair play and substantial justice for Texas courts to exercise personal jurisdiction over MSD.

20.    Specific jurisdiction is established "if the nonresident defendant's alleged liability arises from or is related to an activity conducted in the forum state." *Id.*; *see Guardian Royal*, 815 S.W.2d at 227. Specific jurisdiction is also conferred on the forum state where a "nonresident defendant . . . has purposefully availed itself of the privileges and benefits of conducting business in the foreign jurisdiction." *CRS, Ltd.*, 925 S.W.2d at 594-95; *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985); *see also Electrosource, Inc.*, 176 F.3d at 871.

21.    Here, Texas courts do not have specific jurisdiction over MSD because MSD's alleged liability does not arise from and is not related to any activity conducted in Texas. *CRS, Ltd.*, 925 S.W.2d at 595; *see Guardian Royal*, 815 S.W.2d at 227. The Petition alleges that MSD "manufactured, tested, packaged, formulated, designed, sold, distributed, licensed, performed research and development regarding, marketed and labeled Vioxx in the United Kingdom." (Petition ¶ 7.a.) Thus, by Plaintiffs' own admission, the acts or omissions complained of by Plaintiffs did not occur in Texas, the chosen forum, but rather in the United Kingdom and Ireland. The only mention of the forum state, Texas, with regard to MSD is that "Merck utilized MSD research . . . in order to market Vioxx in New Jersey, Texas and elsewhere." (Pet. ¶ 7.c.) However, this allegation is insufficient to confer specific jurisdiction on the forum state of Texas

---

*Oil Co.*, 526 U.S. 574 (1999). Accordingly, *Villar* remains wholly valid authority.

because MSD did not purposefully avail itself of the privilege of conducting business in Texas. *See CRS, Ltd.*, 925 S.W.2d at 594–95; *Burger King Corp.*, 471 U.S. at 475–76 (1985); *see also Electrosource, Inc.*, 176 F.3d at 871.

22.     In contrast, general jurisdiction exists when a nonresident defendant's "contacts are continuous and systematic, permitting the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state." *CRS, Ltd.*, 925 S.W.2d at 595.   Generally, a Texas court cannot exercise personal jurisdiction over a nonresident defendant corporation "based solely on the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004);  *see Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983). Rather, general jurisdiction requires a showing that "the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction." *Id.*; *see Guardian Royal*, 815 S.W.2d at 228.   Moreover, personal jurisdiction over a parent corporation does not automatically confer jurisdiction on a foreign subsidiary. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (noting "nor does jurisdiction over a parent corporation automatically establish jurisdiction over wholly owned subsidiary").  Finally, MSD has not waived its objections to personal jurisdiction in Texas. *See* Defendant Merck Sharp & Dohme Limited's Consent To Removal (attached as Exhibit H).

23.     In an attempt to establish general jurisdiction, Plaintiffs allege that MSD is an "alter ego" of Merck. (*See* Pet. 7.) However, this theory fails because – unquestionably – MSD is *not* an "alter ego" of Merck. In Texas, "courts are loathe to merge the separate legal identities of parent and subsidiary unless the latter exists as a mere tool or 'front' for the parent, or the

M008A60235

corporate fiction is utilized to achieve an inequitable result, or to conceal fraud or illegality."

*Miles v. American Telephone & Telegraph Co.*, 703 F.2d 193, 195 (5th Cir.1983). Texas courts

look to a variety of factors in evaluating whether one entity is the "alter ego" of another,

including whether:

> (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important by the commentators and Texas courts are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit.

*Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1162-63 (5th Cir. 1983).

24.    In order to "'fuse' the parent company and its subsidiary for jurisdictional

purposes, the plaintiffs must prove the parent controls the internal business operations and affairs

of the subsidiary." *BMC Software*, 83 S.W.3d at 799; *see Hargrave*, 710 F.2d at 1160 (noting

that "100% stock ownership and commonality of officers and directors are not alone sufficient to

establish an alter ego relationship between two corporations). Furthermore, "[t]he degree of

control exercised by the parent must be greater than that normally associated with common

ownership and directorship." *Hargrave*, 710 F.2d at 1160. The alter ego relationship does not

exist unless the evidence shows that "the two entities cease to be separate so that the corporate

fiction should be disregarded to prevent fraud or injustice." *BMC Software*, 83 S.W.3d at 799;

*see Hargrave*, 710 F.2d at 1160. The Plaintiffs bear the burden of rebutting the "presumption of

institutional independence . . . [with] 'clear evidence,' which requires a showing of 'something

beyond' the mere existence of a corporate relationship between a resident and nonresident entity

to warrant the exercise of jurisdiction over the nonresident." *Freudensprung*, 379 F.3d at 346

(quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999)).

25.    An alter ego relationship does not exist between MSD and Merck because MSD is

independently capitalized and has its own corporate structure. Moreover, the daily operations of

the two companies are entirely separate and each functions separately. Lastly, MSD and Merck

maintain separate books and accounts and do not share common directors and/or officers.

Because there is no alter ego relationship between MSD and Merck, Texas courts cannot

exercise personal jurisdiction over MSD based on Merck's contacts with Texas, and MSD is

improperly joined.

26.    Lastly, and in any event, it offends traditional notions of fair play and substantial

justice for Texas courts to exert personal jurisdiction over MSD. A court must consider several

factors in determining whether a forum state's exercise of jurisdiction over a defendant

"offend[s] 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326

U.S. 310, 316 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The factors that the

court must consider include: "(1) the burden on the defendant; (2) the interests of the forum

state, (3) the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Superior Ct. of

Cal.*, 480 U.S. 102, 113 (1987); *Gulf Consol. Servs., Inc., v. Corinth Pipeworks, S.A.*, 898 F.2d

1071, 1074 (5th Cir. 1990).

27.    When these factors are weighed in this case, it is apparent that Texas courts'

exercise of personal jurisdiction over MSD is not reasonable and offends traditional notions of

fair play and substantial justice. The *Asahi* court weighed the three factors in determining

reasonableness. The interest of the plaintiff was given little weight because the plaintiff was not

a resident of the forum state. *Asahi*, 480 U.S. at 114. The interest of the forum was given little

M008A60237

weight because the transaction in question took place outside the forum state. *Id.* The court gave significant weight to the burden on the foreign defendant, explaining, the "unique burdens placed upon one who must defend oneself in a foreign legal system." *Id.* Applying the *Asahi* factors to this case, the interest of the plaintiff should be given little weight because the Plaintiffs are citizens of the United Kingdom and Ireland with no contacts with Texas. Additionally, the interest of Texas should be given little weight because the Plaintiffs were prescribed Vioxx in the United Kingdom, they consumed Vioxx in the United Kingdom and allegedly suffered debilitating and permanently injurious ill effects from Vioxx in the United Kingdom.[4] Furthermore, Texas has no interest in litigating a dispute regarding an alleged act or omission of a foreign defendant that did not take place in Texas, where none of the plaintiffs are citizens of Texas and where all of the causes of action are brought pursuant to New Jersey law.[5] Finally, significant weight is given to the burden on MSD because MSD is a foreign defendant with its principal place of business in the United Kingdom. After weighing the *Asahi* factors it is unreasonable for Texas courts to exercise jurisdiction over MSD and offends traditional notions of fair play and substantial justice.

---

[4]    The Petition alleges that "the requirements of Section 71.031 TEX. CIV. PRAC. & REM. CODE are met." (Pet. ¶ 1.B.) Section 71.031 of the Texas Civil Practice and Remedies Code provides for the procedure to bring a cause of action in Texas where the act or omission occurred out of state. *See* Tex. Civ. Prac. & Rem. Code Ann. § 71.031 (Vernon 1997 & Supp. 2006). It can therefore be inferred from the Petition that the alleged consumption of Vioxx and alleged injuries associated with that consumption occurred outside the State of Texas. (*See* Pet. ¶ 1.)

[5]    Plaintiffs' allegations against Merck and MSD include causes of action for Products Liability-Defective Design (N.J.S.A. 2A:58C-2 et seq.), Products Liability-Failure to Warn (N.J.S.A. 2A:58C-2 et seq.), New Jersey Consumer Fraud Act, N.J.S.A. 2A:56:8-2 et seq., Breach of Express Warranty, Wrongful Death and Survival Action, and Loss of Consortium. (Pet. ¶¶ 39–88.) Plaintiffs' allegation for Products Liability-Defective Design was brought pursuant to New Jersey law, N.J.S.A. 2A:58C-2 et seq. (Pet. ¶¶ 39–46.) Plaintiffs' allegation for Product Liability-Failure to Warn was brought pursuant to New Jersey law, N.J.S.A. 2A:58C-2 et seq. (Pet. ¶¶ 47–53.) Plaintiffs' allegation for New Jersey Consumer Fraud Act was brought pursuant to New Jersey law, N.J.S.A. 2A:56:8-2 et seq. (Pet. ¶¶ 54–70.) Plaintiffs' allegation for Breach of Express Warranty was brought pursuant to New Jersey law, N.J.S.A. 12A:2-313 et seq. (Pet. ¶¶ 71–79.) Plaintiffs' allegation for Wrongful Death and Survival Action was brought pursuant to New Jersey law, N.J.S.A. 31-1 et seq. and N.J.S.A. 2A:15-3. (Pet. ¶¶ 80–85.)

M0008A60238

28.    For this reason too, there is no possibility that the plaintiff will be able to establish a cause of action against the MSD in Texas courts, because they lack personal jurisdiction over MSD. MSD's citizenship should therefore be ignored for purposes of assessing diversity.

**WHEREFORE**, Merck respectfully removes this action from the District Court of Tyler County, Texas, to this Court, pursuant to 28 U.S.C. § 1441.

M008A60239

Respectfully submitted,

FULBRIGHT & JAWORSKI L.L.P.

Gerry Lowry
Attorney-in-Charge
State Bar No. 12641350

1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

COUNSEL FOR DEFENDANT
MERCK & CO., INC.

OF COUNSEL:

John Sullivan
State Bar No. 19485010
Julie Hardin
State Bar No. 24013613
FULBRIGHT & JAWORSKI L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Telecopier: (713) 651-5246

31223800.1    14

MO0BA60240

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent to counsel

of record by certified mail, return receipt requested, on this 14 day of November, 2006.

Joseph C. Blanks
Post Office Drawer 999
Douchette, Texas 75942
Telephone:    (409) 837-9707
Telecopier:    (409) 837-9045

Gerry Lowry

15

31223800.1

M008A60241

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

A CERTIFIED TRUE COPY

JAN 1 7 2007

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

2007 JAN 17  PM 4: 51

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

LORETTA G. WHYTE
CLERK

DEC 2 9 2006

FILED
CLERK'S OFFICE

**DOCKET NO. 1657**

**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

*IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION*

*(SEE ATTACHED SCHEDULE)*

**CONDITIONAL TRANSFER ORDER (CTO-80)**

On February 16, 2005, the Panel transferred 138 civil actions to the United States District Court for the Eastern District of Louisiana for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 360 F.Supp.2d 1352 (J.P.M.L. 2005). Since that time, 5,552 additional actions have been transferred to the Eastern District of Louisiana. With the consent of that court, all such actions have been assigned to the Honorable Eldon E. Fallon.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Eastern District of Louisiana and assigned to Judge Fallon.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Eastern District of Louisiana for the reasons stated in the order of February 16, 2005, and, with the consent of that court, assigned to the Honorable Eldon E. Fallon.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Eastern District of Louisiana. The transmittal of this order to said Clerk shall be stayed 15 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 15-day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Inasmuch as no objection is pending at this time, the stay is lifted.

JAN 1 7 2007

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

Jeffery N. Lüthi
Clerk of the Panel

CLERK'S OFFICE
A TRUE COPY

JAN 30 2007

Deputy Clerk, U.S. District Court
Eastern District of Louisiana
New Orleans, LA

Fee_____
Process_____
X  Dktd_____
___ CtRmDep__9913
___ Doc. No.__9913

M00985599

## SCHEDULE CTO-80 - TAG-ALONG ACTIONS
### DOCKET NO. 1657
### IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

| DIST. DIV. C.A. # | CASE CAPTION | EDLA SEC. L/3 |
|---|---|---|
| **CALIFORNIA CENTRAL** | | |
| CAC 2  06-7329 | Martha Fernandez v. Merck & Co., Inc. | 07-344 |
| **CALIFORNIA EASTERN** | | |
| CAE 2  06-2436 | Ray Slusser v. Merck & Co., Inc., et al. | 07-345 |
| CAE 2  06-2523 | Anthony Gutierrez, et al. v. Merck & Co., Inc., et al. | 07-346 |
| CAE 2  06-2525 | Ruby Wheeler, etc. v. Merck & Co., Inc., et al. | 07-347 |
| CAE 2  06-2546 | Michael A. Gamberg, Sr., et al. v. Merck & Co., Inc., et al. | 07-348 |
| CAE 2  06-2547 | Ernest E. Whitesell, et al. v. Merck & Co., Inc., et al. | 07-349 |
| CAE 2  06-2548 | Nirmal S. Bains, et al. v. Merck & Co., Inc., et al. | 07-350 |
| CAE 2  06-2559 | William D. Schnack, et al. v. Merck & Co., Inc., et al. | 07-351 |
| CAE 2  06-2560 | Susan Leslie, et al. v. Merck & Co., Inc., et al. | 07-352 |
| CAE 2  06-2563 | Kathie K. Sabato, et al. v. Merck & Co., Inc., et al. | 07-353 |
| CAE 2  06-2568 | Michael D. Ento v. Merck & Co., Inc., et al. | 07-354 |
| CAE 2  06-2574 | Terry Gann v. Merck & Co., Inc., et al. | 07-355 |
| CAE 2  06-2575 | Louis M. Fatur, etc. v. Merk & Co., Inc., et al. | 07-356 |
| CAE 2  06-2598 | Joan A. Olson v. Merck & Co., Inc., et al. | 07-357 |
| CAE 2  06-2599 | Denise G. Crank v. Merck & Co., Inc., et al. | 07-358 |
| CAE 2  06-2600 | Betty Phares, et al. v. Merck & Co., Inc., et al. | 07-359 |
| CAE 2  06-2601 | Jacqueline K. O'Sullivan v. Merck & Co., Inc., et al. | 07-360 |
| **CALIFORNIA NORTHERN** | | |
| CAN 3  06-7068 | Joan H. Cole v. Merck & Co., Inc. | 07-361 |
| CAN 3  06-7069 | George Bernal v. Merck & Co., Inc. | 07-362 |
| CAN 3  06-7084 | Maria Estella Rosendo v. Merck & Co., Inc. | 07-363 |
| CAN 3  06-7085 | Roberta Salazar v. Merck & Co., Inc. | 07-364 |
| CAN 3  06-7163 | Katherine Kloverstrom v. Merck & Co., Inc., et al. | 07-365 |
| CAN 4  06-7118 | Michael Sisson v. Merck & Co., Inc. | 07-366 |
| CAN 4  06-7120 | Joanne Rincon, et al. v. Merck & Co., Inc. | 07-367 |
| CAN 5  06-7040 | Viet Tran v. Merck & Co., Inc. | 07-368 |
| **CALIFORNIA SOUTHERN** | | |
| ~~CAS 3  06-2535~~ | ~~Hermogenes Del Rosario v. Merck & Co., Inc., et al.~~ OPPOSED 1/10/07 | |
| ~~CAS 3  06-2536~~ | ~~Maria Graham, etc. v. Merck & Co., Inc., et al.~~ OPPOSED 1/10/07 | |
| ~~CAS 3  06-2537~~ | ~~Sandra Boardman, etc. v. Merck & Co., Inc., et al.~~ OPPOSED 1/10/07 | |
| ~~CAS 3  06-2538~~ | ~~Lloyd Bell, etc. v. Merck & Co., Inc., et al.~~ OPPOSED 1/10/07 | |
| ~~CAS 3  06-2539~~ | ~~Joseph Cornwall, etc. v. Merck & Co., Inc., et al.~~ OPPOSED 1/10/07 | |
| **FLORIDA MIDDLE** | | |
| FLM 5  06-414 | Patricia Terry v. Merck & Co., Inc., et al. | 07-369 |
| FLM 8  06-2178 | Donald R. Breckley, etc. v. Merck & Co., Inc., et al. | 07-370 |
| FLM 8  06-2180 | Costas Gianaros v. Merck & Co., Inc., et al. | 07-371 |
| FLM 8  06-2195 | Victor Rodriguez Rojas v. Merck & Co., Inc., et al. | 07-372 |
| **FLORIDA SOUTHERN** | | |
| FLS 1  06-22737 | Manuel Ramirez, etc. v. Merck & Co., Inc. | 07-373 |
| **ILLINOIS NORTHERN** | | |
| ILN 1  06-6150 | Celia Bucio, et al. v. Merck & Co., Inc. | 07-374 |
| ILN 1  06-6413 | Emma Bruce, etc. v. Merck & Co., Inc. | 07-375 |

M009853600

SCHEDULE CTO-80 - TAG-ALONG ACTIONS (MDL-1657)

| DIST. DIV. C.A. # | CASE CAPTION | | EDLA SEC. L/3 |
|---|---|---|---|
| **ILLINOIS SOUTHERN** | | | |
| ILS 3  06-913 | Donald Cuff v. Merck & Co., Inc. | | 07-376 |
| ILS 3  06-931 | Glenn Romine v. Merck & Co., Inc., et al. | | 07-377 |
| ILS 3  06-934 | Joseph Hogg v. Merck & Co., Inc. | | 07-378 |
| ILS 3  06-935 | Jessie Lucas v. Merck & Co., Inc. | | 07-379 |
| ILS 3  06-936 | Barbara J. McKeal v. Merck & Co., Inc. | | 07-380 |
| ILS 3  06-937 | Jack Ridinger v. Merck & Co., Inc. | | 07-381 |
| ~~ILS 3  06-948~~ | ~~Patricia A. Taylor v. Merck & Co., Inc., et al.~~ | OPPOSED 1/10/07 | |
| ILS 3  06-949 | Pearl Hayes, et al. v. Merck & Co., Inc. | | 07-382 |
| ~~ILS 3  06-965~~ | ~~Richard Schlemer v. Merck & Co., Inc., et al.~~ | OPPOSED 1/10/07 | |
| ILS 3  06-966 | Lucy Petty, etc. v. Merck & Co., Inc., et al. | | 07-383 |
| ~~ILS 3  06-967~~ | ~~Melvin Mayfield v. Merck & Co., Inc., et al.~~ | OPPOSED 1/10/07 | |
| | | | |
| **MARYLAND** | | | |
| MD 1  06-3063 | George Pipiris, et al. v. Merck & Co., Inc. | | 07-384 |
| | | | |
| **MISSISSIPPI NORTHERN** | | | |
| MSN 1  06-313 | V.J. Robinson, et al. v. Merck & Co., Inc., et al. | | 07-385 |
| MSN 3  06-143 | Scott Neal, et al. v. Merck & Co., Inc. | | 07-386 |
| | | | |
| **NEW YORK SOUTHERN** | | | |
| NYS 1  06-13145 | Antonia Cannavo, et al. v. Merck & Co., Inc. | | 07-387 |
| | | | |
| **OHIO NORTHERN** | | | |
| OHN 1  06-2582 | Cynthia L. Walters-Farmer, et al. v. Merck & Co., Inc. | | 07-388 |
| | | | |
| **PENNSYLVANIA EASTERN** | | | |
| ~~PAE 2  06-5124~~ | ~~Marion Gass v. Merck & Co., Inc.~~ | OPPOSED 1/16/07 | |
| | | | |
| **SOUTH CAROLINA** | | | |
| ~~SC 4  06-3225~~ | ~~Joyce R. Sanders, etc. v. Merck & Co., Inc., et al.~~ | OPPOSED 1/16/07 | |
| SC 4  06-3280 | Virginia Dorriety v. Merck & Co., Inc. | | 07-389 |
| SC 8  06-3230 | Ruby Jean Isler v. Merck & Co., Inc. | | 07-390 |
| | | | |
| **TENNESSEE EASTERN** | | | |
| TNE 1  06-249 | Margaret Tregaskis, etc. v. Merck & Co., Inc. | | 07-391 |
| | | | |
| **TEXAS EASTERN** | | | |
| TXE 1  06-732 | Sam A. Malda v. Merck & Co., Inc. | | 07-392 |
| TXE 2  06-476 | George Carter, et al. v. Merck & Co., Inc. | | 07-393 |
| TXE 6  06-492 | Dennis March v. Merck & Co., Inc. | | 07-394 |
| TXE 9  06-255 | Michael Braid, et al. v. Merck & Co., Inc., et al. | | 07-395 |
| | | | |
| **TEXAS NORTHERN** | | | |
| TXN 4  06-805 | Bonnie Davis v. Merck & Co., Inc. | | 07-396 |
| TXN 4  06-815 | Tommy Weddington v. Merck & Co., Inc. | | 07-397 |
| | | | |
| **TEXAS SOUTHERN** | | | |
| ~~TXS 1  06-181~~ | ~~Maria G. Gonzalez v. Merck & Co., Inc., et al.~~ | OPPOSED 1/10/07 | |
| TXS 1  06-185 | Rosalio Adame, et al. v. Merck & Co., Inc., et al. | | 07-398 |
| ~~TXS 3  06-721~~ | ~~John Blazier v. Merck & Co., Inc., et al.~~ | OPPOSED 1/17/07 | |
| ~~TXS 3  06-723~~ | ~~Evert Crump v. Merck & Co., Inc., et al.~~ | OPPOSED 1/17/07 | |
| ~~TXS 3  06-724~~ | ~~Richard Smith v. Merck & Co., Inc., et al.~~ | OPPOSED 1/17/07 | |
| ~~TXS 4  06-3689~~ | ~~Vada Tolbert v. Merck & Co., Inc., et al.~~ | OPPOSED 1/17/07 | |
| ~~TXS 7  06-345~~ | ~~Abdon Gonzalez v. Merck & Co., Inc., et al.~~ | OPPOSED 1/10/07 | |
| ~~TXS 7  06-346~~ | ~~Maria Quintanilla v. Merck & Co., Inc., et al.~~ | OPPOSED 1/10/07 | |
| ~~TXS 7  06-347~~ | ~~Adriana Negrete v. Merck & Co., Inc., et al.~~ | OPPOSED 1/10/07 | |

M009853601

SCHEDULE CTO-80 - TAG-ALONG ACTIONS (MDL-1657)

EDLA
SEC.  L/3

| DIST. DIV. C.A. # | CASE CAPTION | |
|---|---|---|
| TEXAS WESTERN | | 07-399 |
| TXW 1 06-902 | James Mercer v. Merck & Co., Inc., et al. | |
| ~~TXW 5 06-985~~ | ~~Selma Gonzalez, et al. v. Merck & Co., Inc., et al.~~  OPPOSED 1/10/07 | |
| UTAH | | 07-400 |
| UT 2 06-986 | Lisa Ann Phillips, et al. v. Merck & Co. Inc. | |

M009853902

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JANET SUE MORGAN, ET AL.                                    PLAINTIFFS

VS.                                          CIVIL ACTION NO.3:03cv435WS

MERCK & CO, INC., ET AL.                                    DEFENDANTS

**ORDER DENYING PLAINTIFFS' MOTION TO REMAND
AND GRANTING DEFENDANTS' PENDING MOTIONS**

THIS CAUSE came before the Court on:

1.    Plaintiffs' Motion to Remand (#6);

2.    Defendant Dr. Randall Smith's Motion for Summary Judgment (#19);

3.    Defendant Merck & Co., Inc.'s ("Merck") Motion to Reconsider the Court's Order
Granting Plaintiffs' Leave to File First Amended Complaint (#23);

4.    Merck's Motion to Stay Order Granting Plaintiffs Leave to File Amended
Complaint (#24);

5.    Plaintiffs' Motion For Leave To File First Amended Complaint (#14).

Having reviewed the Motions, briefs, supplemental submissions, exhibits and legal
authorities submitted by the parties, having heard the argument of counsel and having otherwise
fully considered the above-referenced Motions, the Court is of the opinion that the Defendants'
Motions are well-taken and should be granted and that Plaintiffs' Motion to Remand and
Plaintiffs' Motion For Leave To File First Amended Complaint are not well-taken and should be
denied.

IT IS HEREBY ORDERED that:

1.    Plaintiffs' Motion to Remand (#6) is denied, because Dr. Randall Smith is fraudulently joined.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship as between Plaintiffs and Merck, the only properly joined defendant, and the amount in controversy for each plaintiff exceeds $75,000, exclusive of interest and costs.

2.    Dr. Randall Smith's Motion for Summary Judgment (#19) is granted.  Judgment is hereby entered in favor of Dr. Smith.

3.    Dr. Smith and Fictitious Defendants A, B, C and D are dismissed with prejudice from this lawsuit.

4.    Merck's Motion to Reconsider the Court's Order Granting Plaintiffs Leave to File First Amended Complaint (#23) and Merck's Motion to Stay Order Granting Plaintiffs Leave to File Amended Complaint (#24) are granted.  Accordingly, the Court's Order granting Plaintiffs' Motion For Leave To File First Amended Complaint (#17) is vacated, Plaintiffs' Motion For Leave To File First Amended Complaint (#14) is denied, and Plaintiffs' First Amended Complaint (#13) is stricken and dismissed.

5.    The Stay Order entered on the Rule 16.1 Case Management Conference (#9) is lifted.  The parties shall submit a Case Management Order to the Court by 5:00 p.m. on Friday, February 27, 2004.

SO ORDERED this the 26ᵗʰ day of _March_, 2004.

_Henry T. Wingate_
UNITED STATES DISTRICT JUDGE

Civil No. 3:03-cv-435 WS
Order Denying Plaintiffs' Motion to Remand
and Granting Defendants' Pending Motions

MO06F26024

Approved as to form:

*Dave Miceli* (SMT w/ Permission)
Counsel for Plaintiffs

*Linda Madalie Turn*
Counsel for Defendant Merck & Co., Inc.

*Michael Coleman* (AATTNY Permission)
Counsel for Defendant Randall Smith, M.D.

JACKSON 159879v1

Civil No. 3:03-cv-435 WS
Order Denying Plaintiffs' Motion to Remand
and Granting Defendants' Pending Motions

3

M006F28026

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

PATRICIA BENAVIDES, Individually §
and as Representative of the ESTATE OF §
LUCIA GUTIERREZ, §
                                     §
            Plaintiffs, §
                                     §
    v.                               §       Civil Action No. L – 03 – 134
                                     §
MERCK & CO., INC., CARLOS §
CIGARROA, M.D., MERCY HOSPITAL, §
AND DENNIS CANTU, M.D., §
                                     §
            Defendants. §

## ORDER

Pending before the Court is Plaintiffs' Motion to Remand [Doc. No. 6] and Defendant

Dennis Cantu, M.D.'s Motion to Dismiss [Doc. No. 41]. The Motion to Remand was referred to

Magistrate Judge Adriana Arce-Flores for a report and recommendation. Judge Arce-Flores filed

the Report and Recommendation on February 24, 2004. No party has objected to the Report and

Recommendation. *See* 28 U.S.C. 636(b). "A party who fails to file written objections to a

magistrate judge's proposed findings and recommendations waives the objection..." *United*

*States v. Kallestad*, 236 F.3d 225, 227 (5th Cir. 2000). Finding no clear error, this Court accepts

the Report and Recommendation. Accordingly, Plaintiffs' Motion to Remand is hereby

DENIED and all claims against Dr. Carlos Cigarroa, Dr. Dennis Cantu, and Mercy Hospital are

hereby DISMISSED WITH PREJUDICE.

43

MDL05F.25026

Having adopted the Report and Recommendation, the Court has already dismissed all claims against Dr. Cantu. For that reason, the pending Motion to Dismiss is **DENIED AS MOOT.**

IT IS SO ORDERED.

SIGNED this ___ day of April, 2004.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY
AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE
BEEN SENT ONE BY THE COURT.

M0056f28027

3731 and Jim Staley 3730

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED

OCT 0 9 2003

KIMBERLY STUBBLEFIELD, et al.

§
§
§

Michael N. Milby, Clerk of Court

VERSUS

§

CIVIL ACTION NO. H-02-3139

MERCK & COMPANY, INC., et al.

§

## ORDER

Pending before the Court is Plaintiff's Motion to Reassign Case to Original Court (H-02-3490) and to Consolidate Cases with Civil Action No. H-02-2139 (Instrument No. 23). The Motion to Consolidate (Instrument No. 23-1) is DENIED. This Court has no authority to reassign either of the other two cases referenced by Plaintiffs and accordingly that Motion (Instrument No. 23-2) is also DENIED. The matter has been referred to the District Clerk's Office to determine if Defendants wrongfully failed to indicate that the case was related to one that had previously been remanded in order to forum shop.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the ___ day of October, 2003, at Houston, Texas.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE

27

**United States District Court, Northern District of Illinois**

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 4203 | DATE | 8/30/2002 |
| CASE TITLE | Scott Zeedyk, on behalf of himself and all other persons similarly situated vs. Merck & Co., Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

> Plaintiff's Motion to Remand back to Circuit Court of Cook County for lack of jurisdiction pursuant to 28 U.S.C. § 1447(c)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ ___.

(3) ☐ Answer brief to motion due _____ Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on ____ set for _____ at ___ ___.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ___ set for ___ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ___ set for ___ at _____.

(7) ☐ Trial[set for/re-set for] on ___ at ___ ___.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ____ at ___ ___.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons set forth on the reverse side of this minute order, Zeedyk's motion to remand for lack of subject matter jurisdiction is DENIED [7-1]

(11) ■ [For further detail see order on the reverse side of the original minute order.]

SEP 0 3 2002

(Not approved for use by the Court)

## ORDER

Before this Court is the motion of plaintiff, Scott Zeedyk, to strike or deny defendant's notice of removal. Plaintiff is a citizen of Illinois. Defendant, Merck, is a citizen of New Jersey. This case involves failure to warn claims and allegations that VIOXX, a prescription medicine manufactured by Merck, caused plaintiff, Zeedyk, to sustain life-threatening injuries.

On May 8, 2002, plaintiff filed his original complaint against the defendant in the Circuit Court of Cook County. On May 20, 2002, the defendant was served with service of process. On this date as well, plaintiff was granted leave of court by the Circuit Court to file an amended complaint instanter. On May 29, 2002, this amended complaint was served on the defendant. Pursuant to 28 U.S.C. § 1332, the defendant filed its first notice of removal, on June 12, 2002, based on its receipt of the original complaint, and on its subsequent receipt of the amended complaint, filed an amended notice of removal on June 25, 2002.

Plaintiff moves to remand because it alleges that Merck failed to conform to Local Rule 81.2. This rule requires that the notice of removal be accompanied by a statement of good faith that the jurisdictional limit is met and by either a response by plaintiff to a request to admit or a response to an interrogatory stating that the jurisdictional limit is met or proof of the failure to respond to such a request to admit or interrogatory. Merck did not provide any such responses with its notice of removal. Defendant argues that where, as here, the complaint clearly establishes that the amount in controversy is in excess of the jurisdictional minimum, the defendant need not establish satisfaction of the jurisdictional minimum through the procedure outlined in Local Rule 81.2.

This Court has previously explained that Local Rule 81.2 is "not the exclusive way in which the jurisdiction amount could be established in a case removed from an Illinois court." Murphy v. Avon Products, Inc., No. 02-C-146, 2002 WL 808386 (N.D. Ill. April 30, 2002); Huntsman v. Whitehouse, No. 97-C-3842, 1997 WL 548043 (N.D. Ill. Sept. 2, 1997). Zeedyk seeks, inter alia, compensatory and punitive damages for Merck's alleged knowing, intentional, willful, reckless, and malicious failure to warn. Plaintiffs seeking similar relief against other pharmaceutical manufacturer defendants and making similar allegations of failure to warn received jury awards well in excess of $75,000. See, e.g., Proctor v. Upjohn, 291 Ill.App.3d 265, 286-87 (Ill. App. 1997) (plaintiff received approximately $3 million in compensatory damages and $6 million in punitive damages for failure to warn claim); Batteast v. Wyeth Labs. Inc., 172 Ill. App.3d 114 (Ill. App. 1988) (upholding jury's award of approximately $9 million in compensatory damages and $13 million in punitive damages). Plaintiff attempted to defeat jurisdiction in this court by specifically pleading in the amended complaint that he was waiving his right to damages in excess of $75,000. However, this is impermissible under Illinois pleading rules, which forbid a plaintiff in a personal injury action from pleading in its complaint any amount of damages other than "the minimum necessary to comply with the circuit rules of assignment where the claim is filed." 735 Ill. Comp. Stat. Ann. § 5/2-604 (West 2002); In re Shell Oil Co., 970 F.2d 355, 356 (7th Cir. 1992). Thus, it is reasonably probable that the amount in controversy exceeds $75,000 where similar claims recovered damages well over that amount.

For the foregoing reasons, plaintiff's motion to remand for lack of subject matter jurisdiction is DENIED.

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
F I L E D

JUN 1 8 2002

ROBERT H. SHEMWELL, CLERK
BY_____
                    DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

JOHN ABRUSLEY, SR.              :    DOCKET NO. 02-0196

VS.                            :    JUDGE TRIMBLE

MERCK & CO., INC., ET AL.       :    MAGISTRATE JUDGE WILSON

### REPORT AND RECOMMENDATION

Before the court is plaintiff's motion to remand or alternatively, motion for leave to amend and then remand. [doc. # 20].[1]

In the summer of 2001, John Abrusley Sr. went to see his doctor because he was experiencing hip pain. (Petition, ¶ 2). His doctor gave him an injection of Risticas and supplied him with samples of Vioxx. *Id.* Abrusley used the Vioxx for two to three weeks, before stopping. *Id.* at ¶ 4. However, several days later, Abrusley suffered a stroke and collapsed – breaking his wrist. *Id.* at ¶¶ 5-9. Abrusley believes that Vioxx caused his stroke and resulting injuries. *Id.* at ¶ 11. Accordingly, on January 11, 2002, Abrusley filed the instant action against the Vioxx manufacturer, Merck, & Co., Inc. ("Merck") in the 33rd Judicial District Court for the Parish of Allen, State of Louisiana. Also made defendant was John Doe, the fictitious name for Merck's salesman or detailer who provided the product samples to plaintiff's doctor.

On January 31, 2002, Merck, timely removed the case to federal court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. Plaintiff is a Louisiana domiliary, and thus, is deemed a

_____

[1] The motion has been referred to the undersigned for decision pursuant to 28 U.S.C. § 636(b)(1)(A).



MDL09F26031

citizen of this state for purposes of jurisdiction. (Petition, preamble). Merck is a New Jersey corporation, with its principal place of business in said state. (Notice of Removal, ¶ 6). The citizenship of John Doe was disregarded because he is a fictitious party. 28 U.S.C. § 1441(a).

On March 27, 2002, plaintiff filed the instant, well-written, motion to remand or alternatively, motion for leave to amend and then remand.[1] Plaintiff contends that because John Doe was sufficiently described in the complaint and readily identifiable by Merck, then he should be considered for purposes of assessing diversity.[2] *Ibieta v. Brinks*, 1997 WL 781291 (E.D. La. 1997); *Tomkins v. Lowe's Home Center, Inc.*, 847 F.Supp. 462 (E.D. La. 1994). We respectfully disagree with these cases. Section 1441(a) unequivocally states that ". . . the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a). No exceptions are contemplated by this rule, and we are not at liberty to impose any.

Even if we treated John Doe as a named, non-diverse defendant, then it would have been incumbent upon the removing defendant to establish that plaintiff had no possibility of recovery against the in-state defendant, and that he had been joined merely to defeat diversity. *Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 815 (5th Cir. 1993)(citing, *Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir. 1992)). Here, defendant satisfied that burden.

In *Furlough v. Warner Lambert Co.*, we recognized that under Louisiana law the only duty owed by detailmen is to deliver and explain the new package inserts to the physicians in their territory. *Furlough v. Warner Lambert Co.*, Civil Action No. 3:01-0704 (W.D. La. 8/8 &

---

[1] After delay for discovery and briefing, the matter is now before the court.

[2] Plaintiff does not contest that the amount in controversy exceeds the requisite jurisdictional minimum. *See*, 28 U.S.C. § 1332. Moreover, we have reviewed plaintiff's allegations and the Notice of Removal. (*See*, Notice of Removal, ¶ 5). We are satisfied that plaintiff's claims exceed the jurisdictional minimum.

2

M006F26932

9/13/01)(citing, *Wallace v. Upjohn Co.*, 535 So.2d 1110 (La. App. 1ˢᵗ Cir. 1988)). However, the instant plaintiff's original petition is devoid of any specific allegations that John Doe, (a detailman) failed to provide the product insert to his physician or that he failed to explain the product insert.[4] Thus, on its face, plaintiff's petition does not state a cause of action against the fictitious defendant, and plaintiff had no possibility of recovery against said defendant at the time of removal.  John Doe is properly excluded from the assessment of diversity.

Plaintiff alternatively seeks to amend his petition to substitute Bryant Tansil for John Doe, and to add defendant-detailmen/salesmen, Sonja Ragusa, James White, Stacey Walters, John Matthews, Vincent Moronto, John Matthews, and Sonya Brantley.  (*See*, First Supplemental and Amending Complaint).  Plaintiff alleges that these individual defendants are Louisiana residents.[5]  Of course, the post-removal joinder of any non-diverse defendant will destroy diversity jurisdiction and require remand. *Cobb v. Delta Exports, Inc.*, 186 F.3d 675 (5ᵗʰ Cir. 1999); 28 U.S.C. § 1447(e).[6]

In *Hensgens v. Deere and Company*, the Fifth Circuit stated that "the district court, when confronted with an amendment to add a non-diverse non-indispensable party, should use its

---

[4]  The closest that plaintiff comes to stating an actionable claim against John Doe is his allegation that he failed to convey the hazardous and dangerous nature of Vioxx to plaintiff and his physician.  (Petition, ¶ 15, 53).  However, this declaration does not specifically allege that the detailman failed to deliver or explain the package inserts to the prescribing physician.  *See, Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5ᵗʰ Cir. 1999)(a petition which fails to state any specific actionable conduct on the part of a non-diverse defendant does not satisfy the liberalized requirements of notice pleading such as to state a valid cause of action); *Hart v. Bayer Corp.*, 199 F.3d 239, 247-248 (5ᵗʰ Cir. 1999).

[5]  Presumably, they are Louisiana domiciliaries.

[6]  The post-removal substitution for a fictitious defendant is also analyzed under 28 U.S.C. § 1447(e).  *See, Doleac ex rel. Doleac v. Michalson*, 264 F.3d 470 (5ᵗʰ Cir. 2001).

3

MODSF20033

discretion in deciding whether to allow that party to be added. . . ." *Hensgens v. Deere and Company*, 833 F.2d 1179, 1182 (5th Cir. 1987)(citations omitted).[7]  In exercising its discretion, the district court is to consider the following factors,

> . . . the extent to which the purpose of the amendment is to defeat federal jurisdiction, whether plaintiff has been dilatory in asking for an amendment, whether plaintiff will be significantly injured if an amendment is not allowed, and any other factors bearing on the equities.

*Hengens*, 833 F.2d at 1182.

Our first consideration is the extent to which the purpose of the amendment is to defeat federal jurisdiction.  Related to this issue is whether plaintiff has a real possibility of recovery against the proposed defendants.  *See, Cobb*, 186 F.3d at 678 (a court should never permit the joinder of a jurisdiction-destroying defendant when recovery against that defendant is not really possible).  Without question, plaintiff's amended complaint alleges a cause of action against the putative individual defendants.[8]  However, Merck submitted an uncontroverted affidavit which establishes that prior to the summer of 2001, putative defendant, Stacy K. Walters, provided the Vioxx product circular to Dr. Nesom (plaintiff's doctor), and explained it to him.  (Def. Exh. C).  Thus, Walters discharged her limited duty as a detailman.  Moreover, even if the remaining putative defendants did not discharge their individual duties to provide and explain the product inserts to Dr. Nesom, any breach of that duty could not have been a cause-in-fact of plaintiff's injuries because Stacy Walters provided that information to Dr. Nesom prior to the summer of

---

[7]  *Hensgens* was decided prior to the 1988 enactment of 28 U.S.C. § 1447(e).  However, some courts have suggested that § 1447(e) was a codification of *Hengens*.  *See, Heininger v. Wecare Distributors, Inc.*, 706 F.Supp. 860, 862, n. 4 (S.D. Fla. 1989); *Chism v. Burlington Northern Railroad Co.*, 1996 Westlaw 408907 (N.D. Miss. 1996).

[8]  *See e.g.*, ¶ 1(c)(the detailman/salesman did not convey or explain the Vioxx package inserts to plaintiff's physician).

4

MOO6F29034

2001. Accordingly, the uncontroverted evidence establishes that plaintiff does not have a real possibility of recovery against any of the putative individual defendants.

Independent of plaintiff's chances of recovery against the individual defendants, we note that the nature of the claims and parties in this case strongly indicate that the primary purpose of the amendment is to defeat federal subject matter jurisdiction. Plaintiff alleges that the detailmen/salesmen are employees of Merck. Thus, Merck would be vicariously liable for any negligence committed by its employees within the course and scope of their employment. The joinder of Merck's employees adds nothing to plaintiff's case – except to secure remand to state court.

Merck concedes that plaintiff was not dilatory in seeking leave to amend. However, Merck alleges that plaintiff will not be significantly injured if the amendment is disallowed. We agree. As stated above, Merck is vicariously liable for its employees' negligence. Merck is fully capable of satisfying any judgment against it. To the extent that Merck could prove insolvent à la Enron or Global Crossing, the fiscal health of the individual employees would be no better. They would find themselves unemployed and struggling to meet mortgage and credit card payments.[1]

For the foregoing reasons,

IT IS RECOMMENDED that plaintiff's motion to remand or alternatively, motion for leave to amend and then remand [doc. # 20], be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have ten (10) business days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

---

[1] There are no other dispositive equities to be considered.

5

MDOEF29035

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 18th day of June, 2002.

COPY SENT:
DATE: 6/19/02
BY: PAM
TO: Hardy
McCall
Cohen
ARW/BB
JB

ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE

6

M00EF.26036

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN ≈ 5 2002

at __9__ o'clock and __44__ min ___ M _____
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DONNA MEIFERT JONES, ETC., ET )     CIVIL NO. 02-00186 SOM-LEK
AL.,                          )
                              )
        Plaintiffs,           )
                              )
    vs.                       )
                              )
MERCK & COMPANY, INC., ET     )
AL.,                          )
                              )
        Defendants.           )
                              )

FINDINGS AND RECOMMENDATION
DENYING PLAINTIFF'S MOTION TO REMAND

On November 23, 2001, Plaintiff Donna Meifert Jones,

individually and as Personal Representative of the Estate of

Frank Newton Jones, Jr., also known as Frank N. Jones, deceased,

("Plaintiff"), filed a Complaint in the Circuit Court of the

First Circuit State of Hawaii against Defendant Merck & Company,

Inc. ("Defendant"), alleging inter alia, strict liability,

negligence, negligence per se, breach of implied warranty, breach

of express warranty, deceit by concealment, negligent

misrepresentation, violation of the Uniform Deceptive Trade

Practices Act, Chapter 481A, Hawaii Revised Statutes ("HRS"), HRS

§ 480-2, and punitive damages.  On March 28, 2002, Defendant

M0067290037

filed a Notice of Removal in the United States District Court for the District of Hawaii pursuant to 28 U.S.C. § 1441(a).

On April 26, 2002, Plaintiff filed the instant Motion to Remand, which District Judge Susan Oki Mollway referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(B) on April 29, 2002. Defendant filed its opposition on May 17, 2002, and Plaintiff replied on May 23, 2002. Pursuant to Local Rule 7.2(d), the Court finds this matter suitable for disposition without a hearing. After careful consideration of the parties' submissions and arguments, this Court FINDS that the action was properly removed from state court, and thus, RECOMMENDS that Plaintiff's motion be DENIED in its entirety.

<u>DISCUSSION</u>

Defendant removed this case from state court on the basis of diversity jurisdiction. A federal district court has original jurisdiction over all civil actions involving citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. <u>See</u> 28 U.S.C. § 1332(a). When federal subject matter jurisdiction is predicated on diversity of citizenship, complete diversity must exist between the opposing parties. <u>See Owen Equip. & Erection Co. v. Kroger</u>, 437 U.S. 365, 373-74 (1978).

Plaintiff now contends that discovery has revealed four

2

M006F29038

distributors who "may have distributed Vioxx in Hawaii." (Pl.'s Mem. in Supp. at 4.) While Plaintiff admits that further discovery is needed to ascertain the nature and extent of Vioxx distribution in Hawaii, Plaintiff asserts an intent to add these distributors to the action. Further, Plaintiff suggests that because these distributors "are licensed to do business in the State of Hawaii," (Id.) the addition of these distributor defendants will destroy diversity jurisdiction and divest the Court of its subject matter jurisdiction.

It is well-established that the Court's diversity jurisdiction is determined at the time the notice of removal is filed. See St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289 (1938). Furthermore, under the removal statute, the citizenship of defendants sued under fictitious names is to be explicitly disregarded for purposes of diversity removal. See 28 U.S.C. § 1441(a).[1]

Plaintiff is a citizen of the State of Hawaii. Defendant, whose principal place of business is in the State of

------

[1] The statute states, in pertinent part, "[f]or purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a). This language was added in 1988 under the Judicial Improvements and Access to Justice Act, in order to curtail the practice of naming fictitious defendants merely to destroy diversity. See Wright & Miller, Federal Practice & Procedure § 3642.

3

MODSF26039

New Jersey, is a citizen of New Jersey.  It is undisputed,
therefore, that complete diversity exists between Plaintiff and
Defendant and that the Court has diversity jurisdiction in this
action.  Moreover, given the explicit language of the removal
statute, the Court must necessarily disregard the citizenship of
the unnamed defendants.[2]

        Nevertheless, the Court is convinced that mere
allegations that the unnamed defendants may be residents of
Hawaii without more, is insufficient to destroy diversity.
Plaintiff's papers seem to suggest that further discovery is
necessary to ascertain the identity and citizenship of the
unnamed defendants.  Under the circumstances, therefore, there is
no specific reason to believe that the unnamed defendants will
prove to be Hawaii citizens.

        Accordingly, and based on the clear language of 28
U.S.C. § 1441(a), this Court FINDS that removal was proper, and
thus, RECOMMENDS that Plaintiff's Motion to Remand be DENIED.[3]

_____

        [2] While Plaintiff's Memorandum in Support identified the
distributors as McKesson Corporation, McKesson Drug Company,
Amerisource Bergen and R. Weinstein, Inc., Plaintiff's Reply
states "Plaintiff does not have the identity of the Hawaii
distributor of Vioxx."  (Pl.'s Reply at 2.)  Accordingly, and
given that Plaintiff has not moved to amend the Complaint to
include these defendants, the Court treats these defendants as
unnamed.

        [3] Defendant aptly cites to Newcombe v. Adolf Coors Co., 157
F.3d 686 (9th Cir. 1998), and points out that the "proper

4

MDXMF.29DJ0

<u>CONCLUSION</u>

For the foregoing reasons this Court FINDS and RECOMMENDS that Plaintiff's Motion to Remand be DENIED.

IT IS SO FOUND AND RECOMMENDED.

DATED: Honolulu, Hawaii:   _____June 5, 2002_____

_Leslie E. Kobayashi_
LESLIE E. KOBAYASHI
United States Magistrate Judge

DONNA MEIFERT JONES, ETC., ET AL. V. MERCK & COMPANY, INC., ET AL; CIVIL NO. 02-00186 SOM-LEK; FINDINGS AND RECOMMENDATION DENYING PLAINTIFF'S MOTION TO REMAND

procedure" would have been for Plaintiff to first seek to add the unnamed defendants and then to move to remand.  <u>Id.</u> at 691 n.2. This Court agrees, and further notes that the ruling herein is consistent with the rationale set forth in <u>Newcombe</u>.  <u>See id.</u> at 690 ("[T]he district court was correct in only considering the domicile of the named defendants . . . . [Plaintiff] filed this suit knowing that there was complete diversity among the named defendants and that removal was a real possibility.").

5

MOD6F 29041